[No. 1473.  Decided November 12, 1894.]

MARY A. MORGAN, *Appellant v.* J. M. MORGAN, *Respondent.*

FRAUD IN PROCURING CONVEYANCE—ACTION TO SET ASIDE—STAT-
UTE OF LIMITATIONS—WHEN BEGINS TO RUN—PLEADING—
AMENDMENT OF.

Where the nature of the answer interposed to a complaint and the proof thereunder clearly indicate that it was the intention of defendant to plead a three years' statute of limitations as a bar, and by mistake the defendant in pleading such statute had specified two years instead of three, it is not an abuse of discretion for the court after the hearing of the cause, to allow an amendment correcting the mistake, although the equities of the case may be in favor of the plaintiff.

An action by a divorced wife against her former husband to set aside a deed of community land to the husband, on the ground that it was fraudulently obtained from her, and was without consideration, and asking for a partition of the land, is not an action for the recovery of real estate, but is one for relief upon the ground of fraud, and must be brought within three years after its discovery, under Code Proc. § 115, subd. 4.

The statute of limitations is not an unconscionable defense.

Although a wife residing in a foreign state may have procured a divorce from her husband, who had settled in this state and acquired lands here, and although she may have been induced through fraudulent representations into releasing her rights in such lands for a greatly inadequate consideration, being ignorant of her rights under the community property laws of this state, yet the fact that she had actual knowledge of the tracts of land owned by her husband, had seen the property and could have discovered its value upon inquiry, had consulted attorneys in her divorce proceedings who could have advised her as to her community rights and who were in a position to know, or easily learn, the value of the lands in controversy, renders her chargeable with such knowledge of the facts constituting the fraud, as would set the statute of limitations running.  (DUNBAR, C. J.,dissents.)

*Appeal from Superior Court, Spokane County.*

*Turner, Graves & McKinstry,* for appellant.

*Thomas C. Griffitts, N. E. Nuzum* and *Fenton & Henley,* for respondent.

The opinion of the court was delivered by

SCOTT, J.—The plaintiff obtained a divorce from the defendant in the Circuit court of Benton county, Oregon, on the 28th day of March, 1888, in which county she with their minor children was then living. The ground alleged was desertion. She was awarded the custody of said children and the sum of $8000 as permanent alimony. The defendant had removed to Spokane in this state (then territory) in the fall of 1879, and thereafter said parties lived apart from each other. While said parties were husband and wife, and were living respectively at the places aforesaid, the defendant, soon after his said removal, acquired two pieces of land situate in Spokane county, which were then of slight value but which the lower court found in this action were worth $80,000 at the time the divorce was granted. With the exception of a small place not exceeding a few hundred dollars in value upon which the plaintiff ant resides, neither of said parties had any property in Oregon. In January, 1888, prior to the commencement of the said suit in Oregon by the plaintiff, she brought suit against the defendant in Spokane county, this state to obtain a divorce and a portion of the property which had been acquired there by the defendant. In pursuance of certain negotiations had between the parties this action was not pressed to a trial and the one aforesaid in Oregon was instituted, which was allowed to proceed uncontested. In this action the defendant was found to have property in Spokane of the value of $25,000 only. In March, 1888, the day the decree was granted, defendant paid said sum of $8000, which was awarded the plaintiff. On the 28th day of April following, the defendant obtained from the plaintiff a quitclaim deed to the land aforesaid in Spokane county. Some time during the latter part of the year 1888, the plaintiff removed to Whitman county in this state. In March, 1892, she commenced the present action wherein she seeks to have said deed set aside, on the ground that it was fraudulently obtained from her and without consideration,

and to have a partition of the lands, and thus to recover
one-half of the lands aforesaid, under the community prop-
erty laws of this state, excepting as to certain of said lands
which had been sold by the defendant, and as to these she
asks that the defendant be called upon to account to her for
her interest therein, and prayed for further incidental re-
lief. The defendant answered, taking issue with the plaintiff
upon the material matters alleged in her complaint, and,
in one of several affirmative defenses pleaded, he sought to
avail himself of the statute of limitations which provides
that an action for relief upon the ground of fraud shall be
brought within three years from the time of the discovery
by the aggrieved party of the facts constituting the fraud.
§ 115, Code Proc. Subd. 4. We deem it unnecessary to
more fully set forth the allegations of the pleadings.

The lower court found in favor of the plaintiff upon most
of the issues involved, finding that the lands aforesaid in
Spokane County were the community property of the plaint-
iff and defendant, and that the plaintiff was under no obliga-
tion to quitclaim her interest therein to the defendant ; that
she did so without consideration and in consequence of fraud-
ulent representations of the defendant to the effect that she
had no rights therein ; that the same did not exceed $25,000
in value and that he was also largely indebted ; and further
found that the defendant had always exercised a great influ-
ence over the plaintiff which in a measure led to the execu-
tion of the deed. The deed upon its face expressed a con-
sideration of $8,000, as paid by the defendant to the plaintiff
therefor. But it is conceded that no money consideration
then passed between the parties, and it only represented, if
anything, the previous payment of $8,000 by the defendant
to the plaintiff upon the date of the decree of divorce afore-
said ; and the court further found that said payment was not
intended to be, and was not, in satisfaction or discharge of
any of plaintiff's claims in or to said property, but that the
considerations for permitting the decree for said sum were
two, viz., that the suit should be brought in Oregon, and
that it should involve no scandal. Of course it is not con-

tended that the Oregon court had any jurisdiction over said lands in this state so that its decree could directly affect the plaintiff's title or interest therein.

As to the statute of limitations the court found that while the plaintiff was wholly ignorant as to the value of said property, and of her rights and interests therein under the community property laws of this state ; yet that she "discovered all the facts constituting the fraud except that she had rights under the community property laws of the, to her, foreign territory of Washington, many years ago ; and became charged with a knowledge of that law, and of the facts resulting therefrom, when she settled here in 1888, about three and a half years before this action was commenced," and found that said statute barred a recovery and dismissed the action ; whereupon the plaintiff appealed.

The material findings were nearly all excepted to by one party or the other and practically the whole case is before us for review. Owing to the conclusion we have arrived at in relation to the applicability of this part of the statute of limitations, it is incumbent upon us only to examine the facts with reference thereto, and it is unnecessary to determine whether the findings of the court otherwise should or can be sustained. It will be necessary, however, to supplement the above condensed statement of the facts somewhat in the discussion of this last question.

A number of questions are raised by appellant against the application of the three years' limitation statute to this action, and it is also contended that if it applies the defendant cannot avail himself of it in consequence of having failed to properly plead it. The only point raised in respect hereto is that the defendant in pleading the statute in his answer as a bar to the action, specified two years instead of three, as the time within which such action must be commenced ; and it is contended that the use of the word "two" instead of "three" destroys the effect which the plea would otherwise have, if established. The word "two" apparently was inadvertently used and was unnoticed by the defendant until after the evidence was taken. It seems that during the

argument of the cause, which was not concluded for a number of days after the testimony was taken, this matter was called to the attention of the lower court for the first time, and the defendant claimed that "two" was a mere clerical error for "three," and asked to amend his answer in this respect. In consequence of some informality as to the manner in which the application was made the court then refused to grant the same, but ruled that the defendant might formally apply for leave to amend upon proper notice to the adverse party, if he desired to do so, in case of an appeal, and meanwhile, as the plea had not been attacked by demurrer but had been treated as sufficient by the plaintiff throughout the trial, or until the argument of the cause, and as the intent to plead the statute was apparent, the court reached the conclusion that the plea was sufficient as it stood to make the defense available. However, application was formally made by defendant for leave to amend in accordance with the previous ruling of the court, and leave was granted and the amendment made.

Appellant attacks the ruling of the court in this matter in each instance, contending that only the two years' statute was pleaded, and that as the court found the equities of the case were with the plaintiff and that she was entitled to the relief demanded, were it not barred by the statute of limitations, it was an abuse of discretion to permit the amendment; that amendments are only allowed in aid of justice—not of injustice—and while the statute of limitations is not always an unconscionable defense, that it may be, and was such under the facts of this case. A number of authorities are cited as sustaining the proposition that the amendment should not have been permitted. But we think that the action of the lower court was right in the premises. The fact that the plea had been treated as sufficient until near the conclusion of the trial, by not questioning the same in any manner, precluded the plaintiff from thereafter attacking it or the evidence introduced thereunder, especially as the intention of the defendant to avail himself of the three years' statute was apparent from the answer and the proofs. The two years' limitation was inapplicable

and no one could well be misled under the answer and proofs
as to the defendant's intention.   The court was justified in
holding the plea sufficient as it stood, and it was also right
to permit the pleading to be amended to correspond with
the proofs.   Under the weight of the authorities the statute
of limitations is not, now at least, generally regarded as
an unconscionable defense.   We regard this so well settled
that we deem a citation of many authorities unnecessary,
but refer to *Wood v. Carpenter*, 101 U. S. 135, where it is
said :

"Statutes of limitation are vital to the welfare of society
and are favored in the law.   They are found and approved
in all systems of enlightened jurisprudence.   They promote
repose by giving security and stability to human affairs.
An important public policy lies at their foundation.   They
stimulate to activity and punish negligence.   While time is
constantly destroying the evidence of rights, they supply
its place by a presumption which renders proof unnecessary.
Mere delay, extending to the limit prescribed, is itself a con-
clusive bar.   The bane and the antidote go together.''

In *Barnett v. Meyer*, 10 Hun, 109, it is said :

'' Whatever may have been the earlier doctrine on the
subject of what are called unconscionable defenses, it no
longer prevails.   The rules which govern amendments are
now to be regarded without reference to the character of
the defense.''

See also *St. Paul, S. & T. F. Ry. Co. v. Sage* 49 Fed.
315, on the statute of limitations as a defense.

But appellant further contends that the three years' statute
of limitations does not apply to this case, even if it is suffi-
ciently or properly pleaded, and this brings us first to a con-
sideration of the nature of the action.

Appellant insists that it is an action to recover real estate,
and if so it falls within § 112 of the Code, which provides
that such action shall be brought within ten years, etc.   In
support of this position appellant argues that there is here
but one cause of action, but one object of the action, namely,
to recover possession of this real estate, and as incident to
that relief she seeks a cancellation of the deed and an account-

ing for the rents and profits during the time she has wrong-
fully been kept out of possession, and also partition; that
although several remedies or reliefs are sought and may be
given upon the final decree, they do not each constitute a
separate cause of action; that the cause of action must be
barred, if at all, as a whole; that to take some relief sought
by the suit and say it would be barred if suit were
brought upon it alone as a cause of action, and therefore the
whole suit is barred, is to give the greater importance to the
incident and the less to the substantive and ultimate, and
as illustrating her position says:

"Suppose an action is brought to reform a mortgage, a
policy of insurance, or other contract in writing, and then to
enforce the same after it is so reformed. Now the ground to
reform may be mistake or it may be fraud. We apprehend
that no court would say, if mistake were the ground of
reformation, that the action would be barred before the stat-
utory period of limitations had run against the instrument
itself; and certainly it is illogical to say that where the
ground of reformation is fraud the action in such case will
be barred in three years. * * * If the three years'
statute is to be applied here, we have the anomaly that a
party against whom no fraud has been committed may have
ten years to sue to recover the possession of his real estate,
and if, perchance, through fraud and chicane, he has lost it,
he must then bring it within three years. It seems to us
that the statute now under consideration was only intended
to apply to a case where the action was brought to recover
purely and singly upon the ground of the fraud committed,
where that fraud was the measure of his rights, the be-
ginning and end of his rights, as, for instance, in an action
to recover damages for deceit or something of that sort."

It appears to us that the cases put here of continuing con-
tracts and of actions for the recovery of real estate, or for its
possession, to which the ten years' statute of limitations
would be applicable, are not parallel ones with an action to
set aside a deed which immediately divested the title of the
grantor upon its execution and delivery. As to whether the
defense of laches might not avail in equitable proceedings,
as to the cases first put, where the mistake was discovered a
long time before the action was brought, or as to whatever

defense might be made thereto, it is unnecessary to inquire, for the defense here in question is founded upon a statute, and it is no conclusive answer to its application to say that it is not full or broad enough to reach all cases which seemingly ought to be entitled to the same protection.  In cases to recover real property, or its possession, to which the ten years' limitation is applicable, the plaintiff, generally at least, has title to, or is the owner of, the property.  It seems to us that this question of ownership is the test or distinguishing feature between actions brought to recover real estate, to which the ten years' limitation is applicable, and actions seeking to recover the same where the title has been parted with in consequence of the fraud of another party, and which determines the latter to be actions for relief upon the ground of fraud rather than for the recovery of real property.  The question presented is a difficult one and the authorities are conflicting.  But the only case cited by appellant which is directly in point is that of *Oakland v. Carpentier*, 13 Cal. 552, where the court, having a similar statute under consideration, says :

"We think that this provision has no relation to an equitable proceeding to set aside a fraudulent deed of real estate when the effect of it is to restore the possession of the premises to the defrauded party.  In such a case, the action is substantially an action for the recovery of the real estate ; indeed, it is literally.  Express fraud, generally, as well avoids a deed at law as in equity, and it would be strange if, after three years, a party could set up the fraud in avoidance of the deed at law, and a different rule prevail in equity. This is really an action for the recovery of real estate, and the plaintiff is no worse off because fraud has been committed upon him, nor the defendant in any better situation, than if the latter had innocently bought and entered under an imperfect title."

There is no force, in so far as our practice is concerned, in the suggestion that a different rule would prevail in an action at law from one in equity.  It seems that this case has not been followed in California, and it is inconsistent with the later decisions there.  In *Boyd v. Blankman*, 29 Cal. 20 (87

Am. Dec. 146), which was an action to set aside a deed on the ground of fraud, the court held that the three years' statute applied, and a like ruling was had in *People v. Blankenship*, 52 Cal. 619. The case of *Hager v. Shindler*, 29 Cal. 48, cited, does not militate against this, for there the action was brought by the owner under a sheriff's deed to set aside a cloud upon his title, and the court held that the holder of such legal title, although he knew of the fraudulent transfer constituting the cloud more than three years before, yet as at that time he had no interest in the lands, the deed to him having been executed subsequently, might bring his action within three years from the receipt thereof; nor does the later case of *Stewart v. Thompson*, 32 Cal. 261, where the court held that said statute does not apply to an action to remove a cloud upon title, although the ruling in *Hager v. Shindler* was modified to this extent. In *Moore v. Moore*, 56 Cal. 89, which is the latest case from that state cited to us, where the action was brought by the grantor to set aside certain deeds which she alleged were fraudulently obtained from her, the statute was treated as applicable.

In *Wagner v. Law*, 3 Wash. 500 (28 Pac. 1109, 28 Am. St. Rep. 56), decided by us, which was an action to quiet title, we held that the statute did not apply in such cases, but were of the opinion that it did apply '' to suits by parties to contracts who are asking to be relieved from contracts that they were fraudulently induced to make, as where a deed has been fraudulently obtained, and suits of that character where fraud is the substantive cause of the action.'' And we so held incidentally in *Ferry v. Ferry*, 9 Wash. 239 (37 Pac. 431). This view is sustained by the decisions of other courts. *Walker v. Pogue*, 29 Pac. 1017 (Cal) ; *St. Paul, S. & T. F. Ry. Co. v. Sage, supra* ; *Chicago, T. & M. C. Ry. Co. v. Titterington*, 84 Tex. 218 (19 S. W. 472, 31 Am. St. Rep. 39) ; *Cooper v. Lee*, 75 Tex. 114 (12 S. W. 483).

We are disposed to follow our former view of this subject. The action must be classed as one for relief upon the ground

of fraud. The deed in question was not void but only void-
able, at most. It passed to the defendant whatever title or
interest the plaintiff had in the lands, and she must have in-
tended it to do so, although it is insisted that she did not know
that she had any interest therein which she could enforce,
and was induced to believe she had none in consequence of
the representations of the defendant to that effect. This will
be more fully noticed later in the discussion of the remaining
feature of the case. The action cannot be classed as one to
recover real estate, within the ten years' limitation statute,
although the result might be, in case of a favorable termina-
tion of it for the plaintiff, to restore to her a portion of the
lands quit-claimed to the defendant. To do this she must
have the deed which she executed set aside, and for this
purpose it is necessary to show that it was fraudulently ob-
tained from her. The alleged fraud of the defendant is the
basis of the plaintiff's action. The statute allows ample
time within which to bring such a suit. It requires it to be
brought generally within a time when the circumstances are
likely to be fresh in the minds of the parties and are suscept-
ible of proof, before the evidence which might constitute a
defense is likely to be lost or destroyed. It is true the time is
uncertain in consequence of the statute requiring the action
to be brought within three years from the time the fraud be-
comes known to the plaintiff, but there must be diligence in
discovering the fraud also. While complications may pos-
sibly arise under the ten years' limitation statute, making in
some cases the relief sought difficult to distinguish in prin-
ciple from that sought here, we are bound to hold, under the
authorities, that the three years' limitation applies to this
action. The fact that it might result in a recovery of real
property is not sufficient to except it therefrom. As to this
proposition we venture the assertion that in the majority of
cases where statutes of limitation in relation to relief upon
the ground of fraud are applied, the title to, or disposition
of, real estate is involved, and a recovery thereof sought in
some manner.

The last contention of appellant respecting this defense is

that she did not discover the facts constituting the fraud until within three years prior to the commencement of the action, and this will necessitate a further reference to the proofs. It is conceded the plaintiff knew, as early as the latter part of the year 1883, of the acquisition of the lands in controversy by the defendant, when she made him an unexpected visit at Spokane of three or four days' duration. Also, that prior to this time she had received letters from the defendant (which are in evidence) mentioning the property and also a lot which he had "bargained" for and built an office upon. In September, 1884, the defendant desiring to pay for this lot and to raise a few hundred dollars additional, negotiated a loan therefor and sent a mortgage securing the note for about $3,000 to her to execute. She telegraphed to him that she would sign the mortgage if he would deposit $1,200 in the bank to her credit. This he refused to do, but informed her that unless she did execute the mortgage the property would be lost. She was not asked to sign the note. A portion of this may be shown only by the testimony of the defendant, but she admits that she received the mortgage ; that she consulted with her father and with an attorney regarding it, and refused to execute it unless the defendant would pay her the sum of money aforesaid ; that she did not execute it and did not return the mortgage to the defendant, and that she was not requested to sign the note.

It is contended by appellant that at the time the defendant removed to Spokane there was no intention upon the part of either of said parties to finally separate as husband and wife, but that the arrangement in regard to his so leaving was an harmonious one, and this contention is largely sustained by letters written by the defendant to the plaintiff during the time up to March, 1882, when his letters grew more formal, although then he said nothing therein as to their separation being a final one, and that she had no thought of a final separation until about the time she commenced proceedings for a divorce, and that this accounted in a measure for her alleged subserviency to him in most matters, and for her not seeking to inform herself better as

to what her rights were in the premises.  She also claims that at all times covering the matters in controversy he possessed a large influence over her, which led her to be governed largely by him, and especially to execute the deed in question.  Giving all due weight to these claims, it is questionable at least whether they were upon a cordial footing during the earlier part of this period.  But whatever the fact was with regard to this, it is evident that the relations existing between them were considerably strained at the time of her visit to him in 1883, when, according to her testimony, he expressed a determination to sell his property and to travel for his health, but that he would return to Oregon before he started.  Whereupon she expressed a desire to have the children put in school and to travel with him.  He objected to this and refused to consent to her going.  She further says that he seemed anxious to get rid of her, that she appeared to be in his way and he wanted her to go back to Oregon.  It is not claimed by her that they lived together or cohabited as husband and wife during the time of this visit, or at any other time after he took up his residence here, and it appears by his testimony that they did not do so.  He says that there was an open rupture between them upon the occasion of her said visit.

Certainly there was no wifely submission upon her part when she refused to execute the mortgage he sent her.  On the contrary, a disposition to act independently of his wishes is manifest, and that she might do so intelligently she sought the counsel of other persons.  After this time the relations existing between them were more formal than ever, although he occasionally sent her small sums of money as he had done previously, which however were entirely inadequate for her support.

The most important step upon the part of appellant, going to show the light she acted in, was the institution of the suit in Spokane county, in January, 1888, for a divorce. As to this it appears from her testimony that in the fall of 1887 she, of her own motion and in consequence of the advice of some of her friends, but without any request

therefor or knowledge thereof on the part of the respondent applied to a lawyer in Portland, Oregon, for advice upon the subject of her rights against her husband, and as to procuring a divorce from him. Said attorney informed her that it would be desirable to employ an attorney residing at Spokane Falls to assist them, and one was employed accordingly. On November 10, 1887, a contract in writing was entered into between appellant and said attorneys with reference to the institution and prosecution of a suit in the premises. Said contract recited,

" That the party of the first part is desirous of procuring a divorce from her husband, Dr. J. M. Morgan, residing at Spokane Falls, W. T. Also a decree giving her custody of minor children, her portion of the property, alimony, etc. * * * That the party of the first part in consideration of the services of the parties of the second part, to be rendered as aforesaid, will give and allow to them, and they shall be entitled to, one-half of all property, real and personal, that may be awarded to the party of the first part by the court in the suit for divorce; except, of course, whatever alimony may be allowed her during the pendency of the suit. * * That the party of the first part will, if required, testify at the trial of the cause to the matters alleged in the complaint which are within her knowledge. That she, the party of the first part, will not settle or compromise with the said Dr. J. M. Morgan as to the property or otherwise without the consent or knowledge of the parties of the second part. That the parties of the second part alone will be responsible for and pay for expenses of this suit."

The contract also provided that said attorneys were to aid in having a certain debt of $654, sued upon in Benton County, Oregon, by J. E. Hinkle & Company, which was contracted for necessaries for the use of family, paid for out of the property of the defendant. This contract was signed by appellant and by the attorneys aforesaid residing at Portland and at Spokane Falls respectively. She makes no claim that she did not know its contents.

It appears from the testimony of the defendant that subsequent to this time he was approached by her attorney, who resided at Spokane, with reference to obtaining a settlement

of their property matters. That said attorney, within a short time thereafter, exhibited to him a complaint which had been prepared for the purpose of instituting the suit for a divorce by appellant, which the defendant says contained false and scandalous charges, and which said attorney informed him that he proposed to file against him, but which it appears was not filed, another one being substituted which prayed for a divorce on the grounds of desertion and a failure to provide, etc., and which alleged that defendant was the owner of property worth about the sum of $50,000, describing the identical real estate in controversy in this action. The record is silent as to whether either of said complaints was submitted to the plaintiff. The last one was verified by one of the attorneys for the plaintiff, for the alleged reason that she was absent from said Spokane county. The complaint first mentioned is not in the record; said last complaint was thereafter filed by said attorneys and summons issued thereon and served upon the defendant.

Prior to the filing of said complaint it seems that appellant was approached by one Leabo, who resided at the same place she did and with whom she had been acquainted for two or three years, and who knew something of the situation of the parties, and he advised her to write to the defendant with reference thereto; to which she responded that it was of no use to do so as she had written to him repeatedly and he would not answer. Whereupon Leabo proposed that he should write, to which she consented.

There is some controversy as to the testimony given by Leabo, who was a witness at the trial, and also as to the capacity in which he acted. Appellant insists that he was never at any time her agent. It appears, however, that she subsequently paid him for his services in the premises; and there is nothing to show that he had ever been approached by the defendant in any manner prior to the time of this correspondence. In fact, it appears from the direct testimony of the defendant that prior to the receipt of the letter he was not acquainted with and did not know Leabo, or know of him. It appears, however, by the testimony of appellant,

that she had consulted with Leabo with reference to her domestic difficulties, and it appears that Leabo did write to the defendant, and a copy of his letter is in evidence as one of the plaintiff's exhibits.  The letter recites that Leabo writes to him, although a stranger, not having any personal interests, but for the welfare of his family ; that it would be for the interest of both parties if the suit about to take place were settled without so much costs ; that he is confident that it could be settled if an offer was made, and that he thought she was entitled to one-half of the property and was willing to settle on that basis, but did not specify any amount.  To this letter the defendant answered that he would "give Mrs. Morgan $8,000 in cash, with this understanding,—that she sue for a divorce in Oregon, and upon the grounds of desertion, and giving me a property release which shall forever release all her right, title, claim and interest in any and all property that I may have at present, or might have hereafter."  This letter was of date December 9, 1887, and is in evidence.

Leabo says that his letters were shown to Mrs. Morgan before he sent them, and with reference to the letter aforesaid received from the defendant, he says he let Mrs. Morgan take it, after she had read it, to show to her father, and that she returned it to him.  Mrs. Morgan does not deny this, but says that she does not remember with regard thereto. Leabo further says that by her direction he telegraphed to the defendant as follows : "Your proposition will be accepted. Send your property release and deposit the $8,000 with Hamilton, Job & Co., Corvallis, and on her signature on the same the money to be turned over to her.  (Signed) T. M. Leabo."  Whereupon the defendant wrote to him another letter with reference to said matters; which is in evidence and is dated December 27, 1887, saying that he would not accept the proposition as made ; that several attorneys, naming them, purporting to act for Mrs. Morgan, had been attempting to negotiate with him with reference to a final settlement and the procuring of a divorce by Mrs. Morgan ; and adding that they had exhibited to him the complaint first

8-10 W

mentioned, and stating that they had not filed it, but had finally proposed that she would proceed to get a divorce upon ground of desertion, in Oregon, and would take such a sum of money as they could agree upon, etc., and he expressed a willingness that she might do so, and a desire that the decree should end whatsoever property rights she might have in common with him and all property rights he might have in common with her; and for this purpose that he would give her the $8,000 in cash which he had previously mentioned. The letter is a long one, and the matter is repeatedly mentioned that the $8,000 is to be in full settlement of her property rights. Appellant's attorneys admit in their brief that this letter "was either shown to Mrs. Morgan by Leabo or its contents communicated to her."

In pursuance of these negotiations, however they were brought about, it appears from the uncontradicted testimony that the plaintiff saw fit to discontinue operations through the attorneys whom she had previously employed and had entered into the contract with as aforesaid. In answer to a question upon cross-examination she admits that she showed this contract to Leabo and asked his advice as to whether it was binding upon her. Whatever conclusion she may have come to, she employed other attorneys in Oregon to institute a suit there in her favor for the purpose of obtaining a divorce, etc. The defendant appeared and filed a demurrer, which was overruled, and the suit was thereafter allowed to proceed uncontested, and a decree of divorce was taken which also awarded the plaintiff the said sum of $8000.

In the two letters aforesaid, there were no representations that she had no interest in the property now in controversy, nor any as to its value except that it was stated that her attorneys had largely overrated it; and it was also stated that the defendant was embarrassed with debt, and that the plaintiff could not maintain a suit for divorce in Washington.

At some time while these negotiations were pending, another attorney was employed by the defendant and sent

to see the plaintiff for the purpose of negotiating a settle-ment between them, who offered her $7500, and she asked $10,000, which she said she supposed was one-half of the value of the property. It appears by the testimony, also, that one of the defendant's attorneys had represented to her that the property was only worth about $25,000, and that the defendant was largely in debt. The fact of his being largely in debt was not satisfactorily established. With reference to the value of the property the testimony is con-flicting and widely different. Some of the witnesses place it below the amount specified by the defendant, and the average value as fixed by the testimony of all the defend-ant's witnesses was about $28,000; while the average amount fixed by the witnesses for the plaintiff was over $100,000.

With reference to the release which it is claimed that she gave at the time of the payment of the sum allowed to her by the decree, the testimony is also conflicting. She says that she never executed any release, but merely gave a re-ceipt for the money. The attorney who had charge of the suit in Oregon for the defendant testifies that she executed a release under seal of all her rights in and to the property in controversy, and there is testimony to show that this re-lease had been burned at the time of a fire at Spokane Falls which destroyed a large amount of property. There is further testimony upon the part of the defendant to the effect that, desiring to obtain a loan upon the property, he had exhibited this release to the party with whom he was negotiating therefor, and that the same was unsatisfactory, and in consequence thereof he asked her to quit-claim as aforesaid. There is also testimony to the effect that the attorney who represented the defendant in the suit in Ore-gon was under the impression that the decree in that case, together with the release, divested plaintiff of any and all interest in and to said property, and that he thereafter dis-covered or thought he was mistaken in the premises, and the deed was procured to correct this mistake.

It is contended by appellant that as the decree provided

for the payment of this $8000 as alimony, the defendant is
estopped from asserting that the payment was for any other
purpose ; and further, that as it appeared by the testimony
introduced in said action that he was only worth the sum of
$25,000, such testimony must be construed as referring to
his separate property and as having no reference to the inter-
ests of the plaintiff therein.　As to the first proposition, it
must be remembered that the defendant had no property in
Oregon out of which the amount could have been collected,
and that the payment was in a measure at least a voluntary
one, and this would have been a sufficient consideration for
a further agreement between the parties, if one was actually
entered into.　Nor is there sufficient ground to maintain the
second proposition.　The property in question stood in the
name of the defendant, and the clear intention of the parties
was, when they were negotiating with regard to this property,
to include the whole of it.　The deed was prepared at Spokane
and was sent by the defendant's attorney to one of the plain-
tiff's attorneys, with a letter stating that it was in accordance
with their prior arrangements, and mentioning that the plain-
tiff had agreed to execute any further documents required to
carry out the provisions of the settlement agreed upon.　The
deed was sent to her by said attorney with a letter saying
she could do as she pleased about signing it, and she saw fit
to execute it.

From the time of the commencement of the suit for a
divorce in Spokane to the time of the execution of this deed
the plaintiff had attorneys looking after her interests, and
she had other friends who were interested in her welfare and
with whom she advised from time to time.　It is not claimed
that she was misled by her attorneys, and it is apparent that
both she and they certainly possessed every means of fully
informing themselves in the premises.　Nor was the deed
obtained in a clandestine manner.　On the contrary it was
openly sought as a matter of right, and was submitted to her
attorney in the first instance, instead of applying to her indi-
vidually.　Subsequent to the execution of the deed, and
more than three years prior to the commencement of this

suit, she was at Spokane several times. In July, 1888, she was there and remained two or three days, and saw a piece of land which she was informed belonged to the defendant. It was shown to her by her son, A. R. Morgan. While she could not definitely locate this land, it fairly appears that it was one of the tracts mentioned in the deed, and she admits that she saw the rest of the land conveyed. In answer to a question as to whether she made any inquiries at that time respecting the value of the land, she said, "I don't know as I did; I might." She was also at Spokane about a month later and again in the fall of said year, remaining a day or two each time. According to her testimony, however, she was sick at the time of said last visit.

A claim is made upon the part of appellant that she is a person possessed of a weak mind and of less than average intelligence, and that this should weigh largely in her favor in considering the facts proven. But we dismiss this claim as not sustained by the record. There is no proof as to her being deficient mentally and it seems to us that the contrary clearly appears from her conduct and the character of her testimony.

It is not contended that the defendant in any way undertook to prevent the plaintiff from fully informing herself with regard to the property. Conceding that he misrepresented its value, and represented to her that she had no rights therein which she could enforce beyond what he was willing to allow her, and that she was ignorant of her rights under the community property laws of the territory prior to the time of the commencement of this action, it is evident that she knew she had some rights in the premises while these divorce suits were pending. The written contract she entered into with her first attorneys sets this question at rest. Prior to that time she knew he could not encumber the land without her participation, when she refused to sign the mortgage. In the action first commenced she asked that such portion of the common property be set aside to her as should be equitable and just, and, as stated, the identical real estate in question was therein described. It matters not

whether she knew that she was an equal owner therein with
him, for the courts here could have decreed to her more or
less, and could have decreed to her a portion of his separate
property, if it was such. *Webster v. Webster*, 2 Wash. 417
(26 Pac. 864); *Fields v. Fields*, 2 Wash. 441 (27 Pac. 267).

Even in allowing alimony the court in Oregon could have
taken into consideration all of the property of the parties
wherever situated, and the record shows this property was
taken into consideration in that case, and the courts here
would most likely have enforced such a decree. The res-
pondent, citing decisions of the supreme court of the state
of Oregon, holding that a decree of divorce conclusively set-
tles the property rights of the parties—see *Ross v. Ross*, 21
Or. 9 (26 Pac. 1007); also *Fischli v. Fischli*, 1 Blackf. 360
(12 Am. Dec. 251), and § 1, Art. 4 of the constitution of
the United States, relating to giving full faith and credit to
the judicial proceedings of other states, with cases applic-
able thereto—has set up the decree rendered by the Oregon
court as a bar to this action, a defense which we have
found unnecessary to consider owing to the view we have
taken of the applicability of the three years' statute of limi-
tations, and we only mention it as going to show that the
plaintiff may not have been mistaken in seeking relief where
she did seek it, and as further going to show that it was
understood that all their property rights were to be settled in
the divorce suit in Oregon, and that it was not merely a suit
for divorce and for alimony independent of her interests in
the property here, as appellant urges.

The fact that she may not have actually known what her
full rights were under the community property law, we have
found immaterial, and it is therefore unnecessary to consider
the ruling of the lower court that she became charged with
a knowledge thereof when she removed to this state, and of
the further question in connection therewith, argued by ap-
pellant, that knowledge of title is a question of fact and not
of law.

The finding of the lower court that she discovered all the
facts constituting the fraud more than three years before the

commencement of this action must be sustained. She had enough actual knowledge to set the statute running, regardless of the question of title. Her admitted acts and doings during the times in question will control and over-ride her other declarations upon the trial of this cause, to the effect that she knew little or nothing at said times respecting the facts involved. The corroborating evidence, although contradicted in many particulars, taken in connection with her own admissions respecting her conduct, etc., renders the proof overwhelming that she had sufficient knowledge of the facts in the premises early enough to render the statute available as a defense.

Affirmed.

STILES, HOYT and ANDERS, JJ., concur.

DUNBAR, C. J. (*dissenting*).—I am loath to disturb the decisions of courts under any circumstances; first, because the presumption is that the matters adjudicated have been rightfully adjudicated; and secondly, because it is necessary for the protection and safety of business interests that unappealed judgments, whether right or wrong, should be considered final. But it is one of the basic principles of the law, which has grown into a maxim, that fraud vitiates all contracts, and the principle must be carried to its logical extremes and made to apply to all the results which flow from the fraudulent contract; and if a judgment is the culmination of a fraud, it must be purged from the taint notwithstanding the degree of credit which is generally accorded it, for the credit only attaches on the supposition that the judgment speaks the truth, or is a truthful announcement of the results of the judicial investigation of the rights of the parties.

A careful investigation of the voluminous record in the case at bar leads me to the conclusion that the judgment which was obtained in the Oregon court was the result of fraud. Even though it be conceded that it was by agreement that the judgment was taken for $8000, the agreement of appellant to accept this amount was obtained by misrep-

resentation, and by the taking advantage of her helpless condition and her inexperience in matters of business. It is doubtless a legal proposition that it was her duty to exercise diligence in ascertaining her rights, but the same test of diligence cannot be applied indiscriminately to all persons. The amount of diligence which would suffice to bring one person within the rule might properly be held to show culpable negligence in a person in another position in life and acting under other and different circumstances. Here was a woman whose business experience had been limited to earning a scanty subsistence for herself and little ones on a small, unremunerative farm in a portion of the Willamette Valley remote from the scenes of business or education. This subsistence was obtained by the hardest kind of physical labor. Deserted by her husband, with the maintenance of these children devolving upon her, which according to the testimony taxed her whole time and strength, the conditions were not favorable for learning enough about values of city property in this state to enable her successfully to compete with a sharp, shrewd speculator like the respondent, who was capable of amassing a fortune of some $80,000 in a short time, and I am satisfied from the testimony that the property was worth that amount at the time the divorce suit was tried. It is true the appellant made a visit to Spokane in 1883, where she remained about three days; but the record convinces me that matters of more weight and importance to her than the values of land were then occupying her mind. She was hustled away by her husband with all possible speed, and returned to her children alone to resume her old line of drudgery.

If it be true, then, that she was deceived and overreached when she agreed to take the judgment for $8000, and it further appears without question that the land which is the subject of this action was in no way affected by the judgment therein rendered, the appellant is certainly morally as well as legally justified in standing upon her technical rights.

The next question then presented is the effect of the quit-

claim deed which respondent secured after the judgment had been rendered in Oregon, when he discovered that, notwithstanding his attempt to overreach his wife, his efforts had been barren and the only result was that he had given her $8000, half of which, however, it must be borne in mind was already hers. In fact, the $8000 being community property, it was simply the transfer of the possession of that amount from the husband to the wife. It is true, probably, that the appellant signed the quit-claim deed honestly undertaking to carry out the agreement which she had entered into. This really strengthens the idea that she was acting in good faith, for she had already obtained the judgment and the money upon the judgment, and had she desired to be dishonest she would have refused to relieve her husband from the embarrassment which would have ensued by her refusal to sign the deed. But no importance can be attached to the deed secured from her by respondent's attorney, if the conclusion is correct that she was imposed upon in the suit so far as the value of the property was concerned ; for that impression was still acting upon and guiding her in the execution of this deed, and if she had made the deed through fraudulent misrepresentations she ought to be relieved from its effect.

The remaining question, then is, has she brought herself within the law so far as the time of bringing this action is concerned, or has she barred herself by waiting until the statute of limitations has run against her rights ? Even had she known the value of her husband's property, or had she failed to exercise the diligence which the law would require of a person in her station and with her intelligence and hampered by her conditions, she did not know what her legal rights were, so far as her community interest in the estate which she then regarded as her husband's property is concerned. Her action, and the manner in which the case was conducted in Oregon, show that the theory of that case was, on both sides, that the property was the separate property of the husband. Mrs. Morgan not being a resident of Washington is not chargeable with the knowledge of the

community property laws of this state, and is therefore not presumed to know that she had any rights in the property involved in this action. This knowledge could not be attributable to her until she became a resident of this state, which she did a little more than three years before the commencement of this action.

The appellant here is not brought under the application of the rule "*ignorantia legis neminem excusat,*" for while a resident of the state cannot be excused for want of knowledge of the law, he is excused for want of knowledge of facts. So that if the appellant brings herself within the statute so far as facts are concerned, the statute of limitations will not run against her; and in this instance it was less than three years after she had knowledge of the fact of her rights under the community property law that the action was brought.

Of course, the mistake of a party as to the legal effect of an agreement which he executes, or the legal result of an act which he performs, is not a ground for relief, but there is a well defined distinction between ignorance of an antecedent existing right which is to be effected by the agreement and the legal import of the agreement itself.

This principle was discussed by this court in the case of *Morgan v. Bell*, 3 Wash. 554 (28 Pac. 925). In that case Bell had contracted to sell community property in which his wife, who was then dead, or rather her heirs, had an interest; not knowing that at the time he was not the exclusive legal owner of the property, simply because he did not know what his wife's rights were under our community property law. And in speaking of that case this court said:

"Thus in this case, if Bell's defense was that he did not know the legal effect of the agreement which he entered into, in the absence of fraud or inequitable conduct on the part of plaintiffs, it would not be a defense to the action; but this is not the defense which he offers, but it is, that he was mistaken about his right to enter into such a contract. 'Mistakes, therefore,' says Mr. Pomeroy, 'of a person with respect to his own personal private rights and liabilities may properly be regarded, as in great measure they are, and may

be dealt with as mistakes of facts.   Courts have constantly felt and acted upon this view, though not always avowedly.' "

The authorities on this interesting question are collated and discussed in Morgan v. Bell, *supra*, and the conclusion there reached was that the want of knowledge of one's right to title under the community property laws of this state was ignorance of fact and not ignorance of law.   The appellant here, then, having brought herself within the law so far as the time of the commencement of the action was concerned, and having shown to my satisfaction that any disposition that she has ever made of the rights of the property involved was made through misrepresentation and fraud, which, considering her condition and circumstances and surroundings, she could not reasonably be expected to have resisted, I think she should in equity and good conscience be allowed a just proportion of the estate owned and controlled by the respondent.

The argument of the majority that when she commenced her action for divorce in Spokane, which was subsequently withdrawn, she ought to have known, even though she did not know, what her rights were under the community property law ; that the court would have authority to adjudicate the property according to the rights of the case, as decided by this court in *Webster v. Webster*, 2 Wash. 417 (26 Pac. 864), and *Field v. Field*, 2 Wash. 441 (27 Pac. 267), is disposed of by what I have said above, that not being a resident of this state she would not be held to a knowledge of the laws of this state.

My conclusion, therefore, is that the judgment should be reversed.