[No. 7727. Decided March 27, 1909.]

SADIE TAUSICK, *Appellant*, v. EUGENE TAUSICK, *Respondent*.[1]

DIVORCE—VACATING JUDGMENT—ACTION TO VACATE — PLEADING— DEMURRER TO DEFENSES. In an action to set aside a divorce for fraud, a demurrer to the defense of laches in prosecuting the suit is properly overruled, although it may have been unnecessary to affirmatively plead it.

SAME—DEFENSES—LACHES—EVIDENCE. In an action to set aside a divorce obtained, as claimed, by the duress of threatened false charges of adultery, evidence of such adultery is properly admitted in defense of the action to show that the charges were not false, and that defendant had good grounds for divorce.

APPEAL—REVIEW—HARMLESS ERROR. Error in admitting evidence is harmless where the case is tried *de novo* on appeal.

DIVORCE — VACATING — ATTORNEY AND CLIENT — APPEARANCE—AUTHORITY. A decree of divorce, entered without service of process and upon defendant's appearance by attorney, will not be set aside for want of authority for the attorney to appear, where the defendant verified the answer and knew of the purpose of the suit and knew of the decree, and shortly after was apprised of her rights, and it appears that she only became dissatisfied later when the husband refused to carry out promises with reference to a settlement.

DIVORCE—VACATING—CANCELLATION OF SETTLEMENT—DURESS—EVIDENCE—SUFFICIENCY. The dismissal of an action to set aside a settlement between the parties to a divorce and the deed made by the wife, for alleged fraud and duress by false charges of adultery, is,

[1]Reported in 100 Pac. 757.

sustained where it appears that she had the property settlement under consideration for some time, knew the character of the property and contents and effect of the deed, which she finally acknowledged, after first protesting she did not do so "freely and voluntarily" and where she acquiesced in the settlement for some two years after being advised as to her rights by an attorney, and there was evidence warranting the husband's belief in the charges which he made, and for which he divorced her.

Appeal from a judgment of the superior court for Walla Walla county, Brents, J., entered May 25, 1908, in favor of the defendant, dismissing, after a trial on the merits, an action to set aside a divorce on the ground of fraud, and to declare a trust. Affirmed.

*Cary M. Rader* and *Elihu F. Barker*, for appellant.

*T. P. & C. C. Gose*, for respondent.

CHADWICK, J.—This action was begun May 9, 1907, by Sadie Tausick, to set aside a decree of divorce, rendered in favor of Eugene Tausick on the 28th day of February, 1903, and to declare a trust in the property now in defendant's name. The case went to trial on the merits, and a decree was entered dismissing the complaint. Plaintiff has appealed.

She makes the following assignments of error: That the court erred in overruling the demurrer to the third and fourth paragraphs of the answer and affirmative defense; the court erred in admitting evidence of adultery on the part of appellant; the court erred in dismissing the complaint of appellant; the court erred in refusing to enter judgment for the appellant. The pleadings are of necessity drawn out to a great length, but the issues are sharply drawn. Appellant must recover, if at all, upon the theory that in the divorce proceedings she was not a voluntary agent, but was coerced and by fraud and duress induced to sign away her rights in the property then standing in the name of her husband, and to file an answer admitting the allegations of her husband's complaint, in which she asked no affirmative relief. She alleges, that the coercion and duress consisted in false

charges of adultery; that her husband threatened if she did
not consent to a divorce and division of the property upon
terms fixed by him, that he would file a complaint charging
her with adultery, and sustain it by the testimony of certain
witnesses whom he had employed to obtain evidence against
her. It is further alleged that he coerced her by charging
that she had conspired with his bookkeeper to rob him. She
says that all of these charges were untrue, but because of her
then weakened physical condition and mental distress, she
lacked sufficient strength to assert and defend her rights.

A divorce was obtained on the grounds of mutual dislike,
incompatibility of temper, and such difference in tastes and
habits as made the one spouse burdensome to the other. The
record in the divorce proceeding shows that she was repre-
sented by an attorney who has since died. No service of
summons was made upon her, and she was not present at the
trial, and she now says that the divorce was obtained without
her knowledge, and that the attorney of record appeared
without her authority. About that time, either the day after
as testified to by respondent, or within about two weeks as
testified to by appellant, respondent gave to appellant a
certificate of deposit for the sum of $2,000, and also about
$200 in money. He claims to have since given appellant
enough money to aggregate the sum of $3,150. The largest
amount given her at one time was the sum of $500, to enable
her to make final payment upon a cottage which she was pur-
chasing for her own use. He also testified that he gave her
about $850 in household goods and personal property. He
also gave her money to meet the expenses of two or three
summer trips to the ocean beach. Appellant's position is
somewhat anomalous. It is not quite certain whether the
theory of her complaint that the court did not acquire juris-
diction and that she was coerced into signing the deed to re-
spondent's property, or the theory that runs in and out of her
testimony for its whole length that she settled with respondent
and allowed him to take a divorce upon the understanding

that he would do the right thing by her in the way of a property settlement and future advances which he has failed to keep, is the one upon which she most relies. However that may be, we shall address ourselves to the assignments of error in their proper order.

We are of the opinion that no error was committed in overruling the demurrer to the third and fourth paragraphs of the affirmative defense (numbered 3 as we shall assume, although they are not specified in the assignments of error). These paragraphs charge appellant with laches in the prosecution of her remedy, if she has one, and were properly pleaded, although possibly unnecessarily so. We think the court committed no error in admitting evidence of adultery. Appellant had alleged in her complaint that respondent had charged her with adultery and that such charge was. false, but nevertheless, because of her mental and physical distress, she had yielded to his demand and had consented to the divorce, and to signing away her right in the property. Respondent was therefore warranted in offering evidence to show that, from his point of view at least, the charge was not false, and that he had lawful grounds upon which to prosecute an action. The view we take of this case makes the assignments of error already noticed immaterial. The case is here *de novo*, and the true merit of the case can be tried without reference to them.

The position taken by appellant, that the court was without jurisdiction in that the appearance made by the attorney Cavanaugh was made without authority and was therefore not binding upon her, should be first determined. Many cases are cited to sustain the proposition that an attorney appearing for another without authority gives the court no jurisdiction over the party he assumes to represent. Had this case come to us upon an order sustaining the demurrer to the complaint, we would have hesitated before deciding that the demurrer was not well taken. Indeed, it is most likely that the complaint itself shows that the court had jurisdiction

of the defendant. But inasmuch as the trial court treated the complaint as sufficient and tried out the issue, we shall assume that it states a cause of action. But the facts, in our judgment, do not bear out appellant in her contention. She knew that her husband had set about to get a divorce. Whether the attorney was selected by her or by him is a disputed proposition. But after several days' consideration, she signed the verification to the answer, the contents of which she knew, and the purpose of which she probably knew. If not, the law will charge her with such knowledge. The standing of the attorney is not shown to be such as to warrant the court in presuming even that he was a party to a most detestable fraud on appellant. The fact that she did not know that the case was tried at the time it was tried, and was not present, can make no difference. Her answer was such that her presence could have added nothing to the formality of the proceedings or to the information of the court. She knew of the decree in the divorce case; if not immediately, very soon after it was rendered, and some time after that she consulted with attorneys, at least two of them, and must have been apprised of her legal rights. Aside from this, her testimony taken as a whole does not bear out her complaint. It indicates to our mind that her dissatisfaction comes, not so much from the unauthorized appearance of her attorney, as from the fact that she believes her husband has not carried out his promise with reference to the settlement of money upon her after the decree was rendered. In other words, if respondent had met her demand subsequently made, the question of jurisdiction would have been admitted. A circumstance very like the present one was a factor in the case of *Turner v. Turner*, 33 Wash. 118, 74 Pac. 55. In considering the relation of the attorney whose authority was disputed the court said:

"She admitted that he held a retainer from her, and was looking after her legal business in Spokane, and that she had consulted with him concerning the probabilities of such

a suit, but she is positive in her assertion that she never authorized him to appear in the proceeding or waive the service of process upon her. There are circumstances shown by the record, however, which appear to put her memory at fault. The attorney who purported to represent her was an able and distinguished lawyer, who had enjoyed a large and varied practice, and who knew well the effect upon the judgment had his appearance in the proceedings not been authorized. He died just prior to the trial, and we have not the benefit of his testimony, but his letters to the appellant, written just before and just after the decree, are in the record."

While there are no letters or other written evidence here as there was in that case, the conduct of the attorney is in evidence before this court, and his acts being unchallenged during his lifetime, we are convinced that appellant is mistaken in the fact or the legal consequences of her then situation. We conclude that the court had jurisdiction and that the decree in the divorce case was properly entered.

The remaining question is whether appellant signed the deed to respondent in settlement of their property rights, of her own free will and without duress on the part of her husband. Without entering into an extended discussion of the testimony, we think there is abundant evidence to sustain the finding of the lower court, and that her complaint was properly dismissed. She had the matter of property settlement under consideration for some time. She knew that the character of the property, whether community or separate, was an item in dispute. She knew the contents of the deed, as well as its legal effect. It is not shown that respondent in any way undertook to prevent appellant from fully informing herself with regard to the property and her right to share in it. *Morgan v. Morgan*, 10 Wash. 99, 38 Pac. 1054. The deed which she signed was prepared by Mr. Thomas Dovell, attorney for respondent, and was signed by the appellant in his office, and in his presence, and in presence of Mr. Otto B. Rupp, an attorney of standing at the bar of Walla Walla county, who had no interest in the case. Both

of these gentlemen testified that the deed was voluntarily signed by appellant, Mr. Dovell saying:

"Mrs. Tausick came to my office for the purpose of executing a deed and, I think, a bill of sale of real estate and personal property to Mr. Tausick. She came into the office. I had the instruments prepared. My recollection is not distinct as to everything which occurred. I can only detail it now as I can recollect, although as to some things I have a very distinct recollection. I had the instruments prepared, but I would not say that I read them to Mrs. Tausick or that I gave them to her to read; I don't know which. I remember, however, saying to her, asking her if she understood that these were instruments which divested her of any community interest that she might have in Mr. Tausick's property, and she said that she understood that. If I didn't give them to her to read or didn't read them to her, I am pretty sure I gave her abundant opportunity to read them. I asked her to sign them, and she signed them. I then asked her if she acknowledged that she executed these instruments freely and voluntarily and for the uses and purposes mentioned in the instruments. I say that I used that expression to her because I always do when I take an acknowledgment. Just what she said in reply, I am not prepared to say exactly. There was some demurrer. My present recollection of it would be that she said that she executed them freely and voluntarily, but did not consent to them or did not want to consent to them, or something of that kind. Just as soon as she said that, I said to her: 'I can take no acknowledgment in that way.' I have quite a distinct recollection that a few words passed between us. I think, probably, I said to her that there was no difference between saying that you execute anything freely and voluntarily and consenting to it. There was certainly no more than a very few words passed between us, and I stepped out of the room into another room and left her there. A little later, a few minutes later, she indicated to me in some way (by sending some one to call me or by calling me herself) that she was ready to acknowledge these instruments. I came into the room. I again asked her if she acknowledged that she executed these instruments freely and voluntarily and for the uses and purposes mentioned in them, and she said she did. I then appended my acknowledgment to them, and she left, and that was all there was to it.

Q.  Did you observe whether she was enjoying apparently good health at that time, or whether she was ill?  A.  She was apparently in good health at that time."

Mr. Rupp remembered the incident of signing the deed as follows:

"I was present in his office some time between the 14th day of January, 1903, and the first day of April, that year, at which he took an acknowledgment to a deed which Mrs. Tausick signed and acknowledged at that time.  I cannot tell you what the exact date was.  Q.  You may now state to the court just what was said and done by Mrs. Tausick and Mr. Dovell at the time the acknowledgment was taken.  A.  At the time this transaction took place, I was reading law at Mr. Dovell's office.  It consisted of three rooms, an entrance room which you might describe as the northwest room, a room to the east of it occupied as a private office, and a room to the south.  I was in the south room alone reading.  Mr. Dovell and Mrs. Tausick came in that room, and I immediately got up from my seat to give Mrs. Tausick the chair, and started to leave the room.  While I have no independent recollection of Mr. Dovell's requesting me to remain, yet I know he did so or I would have left the room.  A paper was placed before Mrs. Tausick.  I think Mr. Dovell brought the paper in with him, probably.  Mrs. Tausick took the seat I had vacated and apparently read over the paper.  She was at least given ample time and opportunity to do so.  While Mr. Dovell and I remained standing and when she had read the paper over, or had apparently read it over, he said something to her (the exact language I cannot now remember) but I think he said this: 'You understand, Mrs. Tausick, do you, that this is a deed which divests you of all right, title or interest to the real estate described in it, and you sign and execute the same freely and voluntarily?'  Mrs. Tausick at once replied and said: 'Why, no, Mr. Dovell, I do not.'  As to what took place from that time on I do not exactly remember.  I do remember this, however: Mrs. Tausick insisted that she consented to the signing of the deed, but insisted that she did not do it freely and voluntarily.  I may say that I was somewhat perplexed and surprised by her distinction between the two, and apparently Mr. Dovell was equally so.  Some debate took place between them.  He could

not understand, if she consented to it, why she did not do it freely and voluntarily, and after a conversation along on the distinction that she was apparently trying to make between consenting to it and doing it freely and voluntarily, she even said she was willing to do it, but not freely and voluntarily. Mrs. Tausick, however, subsequently said that she did it freely and voluntarily, and Mr. Dovell at that time repeated her language, or said something like this: 'You do then sign this deed and acknowledge it freely and voluntarily for the purposes set out in the deed,' and Mrs. Tausick replied: 'I do.'"

Appellant herself narrates the occurrence at Mr. Dovell's office as follows:

"Q. Did you find Mr. Dovell in the office? A. Yes, sir; I think he was there; if he wasn't, he came in in a few minutes. Q. Do you remember any one else being in the office? A. Yes, sir. Q. Who? A. Otto Rupp. Q. What did Mr. Dovell say and do when you arrived at the office? A. He said he had a paper for me to sign and handed it to me. Q. Did you sit down at the desk or table? A. Yes, sir. Q. And he handed you the instrument? A. Yes, sir. Q. Did you read it? A. I read part of it; but I was so nervous that I didn't go over all of it; I didn't read all of it. Q. Did you sign it? A. Yes, sir; I did. Q. Did any conversation occur then between you and Mr. Dovell? A. Yes, sir. Q. What was said and done? A. He asked me if I signed that of my own free will, and I told him, I said: 'No, Mr. Dovell, you know that I do not; you know that I do it under compulsion.' Q. Was Mr. Rupp or any one present at that conversation? A. Yes; I am sure that Mr. Rupp was there all the time. Q. Did you have any further conversation with Mr. Dovell then and there? A. Well, he talked to me about signing; and finally I told him that I consented to sign it, and I came very near tearing the papers all to pieces then."

In cross-examination she said:

"Q. Did you say that you never told Mr. Dovell that you signed that deed freely and voluntarily? A. No, sir; I told him that I consented to sign it. Q. Did Mr. Dovell ask you if you signed that deed by using the words that appeared in the acknowledgment? Didn't he, Mrs. Tausick, didn't he

repeat right from the acknowledgment the formal words in the acknowledgment, when he asked you first about the deed? A. He asked me if I signed it of my own free will; he may have used those exact words. Q. 'Freely' and 'voluntarily?' A. Yes, sir; I think that was what was used; and I said: 'Mr. Dovell, you know that I do not.' Q. Did he tell you that he could not take your acknowledgment to the deed unless you did say so? A. Well, not exactly; he talked to me a little bit, and said that it was the best thing I could do, or something to that effect, for I would eventually have to do it. Q. He told you that you would eventually have to do it? A. Yes, sir; to that effect. Q. And that you had better sign it? A. He advised me to sign it. Q. Did he urge you in any way to sign it? A. Well, I can't say—in a way, he did; he said that Mr. Tausick would do whatever he had said he would. Q. That Mr. Tausick would keep his agreement with you? A. Yes, sir. . . . Q. Did you think that you still retained a half interest in it when you signed it? A. I understood that I was to have my share of the property in money. Mr. Tausick said that he could take care of the business better; and, if the deed was made over to him, it would save the bother of him coming to me about that."

The last answer is but one of many that, when taken in connection with her subsequent conduct, indicate that it was her understanding that the property was to be deeded over to her husband absolutely. The fact that she accepted the $2,000 certificate of deposit without protest, and the tenor of the several letters written by her to respondent, asking for accommodations in the way of money, all go to show that she was not proceeding upon the theory that she had any interest in the property of respondent. On the 27th day of November, 1905, well on to two years after the divorce was granted and after she had consulted with Mr. Sharpstein, an attorney at the bar of Walla Walla county, who had, according to her own testimony, advised her with reference to her probable rights, she wrote the following letter to respondent:

"Walla Walla, 11-27-05.

"Dear Mr. Tausick.—I have waited over a week thinking you would come up every day—of course I know you do

not want to see me—neither is it pleasant for me—but I am so uncomfortable here and it seems to me you would surely not begrudge me a little home of my own when you have so much and me nothing. I have found a little house of 5 rooms already built that is just what I would like to have but as you know I cannot get it without your help—I can almost make my expenses could quite if I did not have rent to pay. You certainly know it is not pleasant for me to ask anything of you and I never will again if you will help me in this. Will you not let me know now what you will and will not do. Yours sincerely, Sadie."

Respondent had been informed of certain indiscreet conduct on the part of his wife. He believed that she had been unfaithful to him. We shall not go into the details of this testimony, or determine her guilt or innocence. It is enough to say that the testimony convinces us that he believed the charges to be true, and because of this belief he severed all marital relations with his wife. The testimony shows that he fully informed appellant of his reasons for divorcing her, and whether innocent or guilty, she admitted her presence with others and under such circumstances as might well be calculated to impress the doubting, jealous mind as "confirmations strong as proofs of Holy Writ." The testimony shows further that the separation was mutual; that they undertook to finally settle their property rights; that practically all of the property was owned by the respondent at the time of his marriage; and that she had ample time to consider the justice of the settlement before signing the deed. Finding these facts in the record, we cannot now say, although it should appear that the settlement was to a degree improvident on the part of appellant, that the contract of the parties should be broken and a new contract made for them, to cure the dissatisfaction of one of those concerned. Mere inadequacy of consideration is not enough to avoid a contract entered into between parties of mature judgment, nor can one who claims to have been overreached invite the review of a court of equity unless the inadequacy of consid-

eration is so great that a presumption of fraud follows the recital of the transaction. We are not prepared to say that appellant agreed to take less than was her just due. The lower court was warranted in dismissing this action upon the authority of the following cases decided by this court: *Turner v. Turner, supra; Morgan v. Morgan,* 10 Wash. 99, 38 Pac. 1054; *Long v. Long,* 38 Wash. 218, 80 Pac. 432; *Peyton v. Peyton,* 28 Wash. 278, 68 Pac. 757; *Ferry v. Ferry,* 9 Wash. 239, 37 Pac. 431; *Wickham v. Sprague,* 18 Wash. 466, 51 Pac. 1055; *Chezum v. Claypool,* 22 Wash. 498, 61 Pac. 157, 79 Am. St. 955.

The judgment of the lower court is affirmed.

RUDKIN, C. J., FULLERTON, MOUNT, DUNBAR, and CROW, JJ., concur.

GOSE, J., took on part.