[No. 9752. Department Two. January 19, 1912.]

MARY E. MORGAN, *Respondent*, v. FIDELITY AND DEPOSIT COMPANY OF MARYLAND, *Appellant*.[1]

SHERIFFS—FALSE RETURN—LIABILITY — DEFENSES — ESTOPPEL. A sheriff and his official bondsmen are not liable for making a false return of service whereby judgment of divorce was wrongfully obtained against a wife, where the wife, when presently informed of the divorce, did not move to set it aside, but entered into a contract for the payment of alimony referable to the decree, and only sought to hold the sheriff where after some years the husband failed to make the payments for her support.

Appeal from a judgment of the superior court for Whatcom county, Kellogg, J., entered March 24, 1911, upon the verdict of a jury rendered in favor of the plaintiff, in an action upon the official bond of a sheriff, after a trial on the merits. Reversed.

*William W. Wilshire*, for appellant.

*Craven & Greene*, for respondent.

[1]Reported in 120 Pac. 106.

CHADWICK, J.—On November 14, 1907, George W. Morgan began an action for divorce, in King county, against the plaintiff in this suit. Summons was placed in the hands of defendant Andrew Williams, who was sheriff of Whatcom county, for service. It is alleged that no service was made, but that a false return showing personal service was filed by the sheriff, upon which a default was entered, resulting in a trial and decree in favor of George W. Morgan. The decree was entered on December 7, 1907; and by its terms Morgan was bound to pay this plaintiff $60 per month. The court found that there was no community property. Plaintiff did not know of the divorce proceeding or its termination until some time in February, 1908. George W. Morgan afterwards remarried, and because of the contentions of plaintiff and the complications resulting from a second marriage, he entered into an agreement with this plaintiff whereby he undertook to pay her $100 to $150 per month, in lieu of the $60 as provided in the decree. In aid of our statement, we will quote a part of plaintiff's testimony in this suit:

"Q. What, if any thing, was said between you and him when you made that visit down there, about his continuing to supply money to take care of the family? A. Yes, sir; he said he would continue to see that we had plenty. Q. Did he fix any amount he was going to send up to you every month? A. No, sir; not at that time. Q. Did he at any other time? A. Only in promises. Q. When was the first time he made such an arrangement with you as that? A. It was about a year after that. Q. A year after the divorce had been given? A. Yes, sir. . . . Q. What was the promise you and he made then, or what was the understanding between you and him at that time? . . . Q. About a year afterwards when he was to send up some money? A. It was about November, I think. He came up one day and told me that this woman he had married had left him and he felt very blue and he was going to contribute right along from $100 to $150 a month. Q. Did you enter into any written agreement with him at that time? A. No, sir. Q. Wasn't something said about making a written agreement to that effect, and wasn't there a paper drawn but not signed? Mr.

Greene: I object as not being proper cross-examination. Q. What did you say to his proposal to send up $100 to $150 a month? Did you agree to that? A. You would think I would, but I do not know what I said. Q. You agreed to it? A. Yes, sir. Q. And that was when he told you that the woman had left him? A. Yes, sir. Q. And he seemed to feel bad about it—did he send up some money after that to you? A. Yes, sir; he sent money pretty regularly. Q. How much did he send at a time? A. He never would send over about $125 in a month, but he sent that right along until he married again. Q. He got another wife? A. Yes, sir. . . . Q. Along in the spring of the year? A. Yes, sir. Q. Following that November, that promise, he sent that money? A. Yes, sir. Q. How much did he cut down your allowance after that? A. It has never been regular since that time. Q. But he has been sending it to you irregularly off and on? A. Yes, sir. Q. When did he send you the last money? A. I do not know when I have had anything direct from Mr. Morgan, but he sent a lawyer up to bring me some money some time ago. Q. When you found out this divorce had been given, did you get a copy of the judgment to see what it said or what it had in it? Did you read—it did make a provision in there for so much a month in the decree of divorce? A. I do not know. Q. You had the matter investigated to find out about the divorce? A. Yes, sir. All I knew was after I investigated. Q. You had that investigation made when you first found he was remarried in February, 1908? A. Yes, sir. Q. Then you learned what there was in those papers, your attorney investigated that for you? A. Yes, sir."

Morgan removed from the state of Washington, taking his property, if any, with him, and has since failed to punctually keep his contract, and as it is alleged neglected to provide for his family as was his custom theretofore. Upon the facts plaintiff brought this action against defendant Williams and the surety upon his official bond.

The essential allegations of plaintiff's complaint are denied, but inasmuch as the case went to a jury, we shall accept the verdict as the fact. A demurrer was filed to the complaint and overruled. The objection that the complaint does

not state a cause of action has been preserved. This order of the court is assigned as error. Considering, therefore, the demurrer and the complaint as aided and sustained by the evidence offered in behalf of plaintiff, we think clearly that plaintiff has mistaken her remedy. The decree in the divorce case was not void but voidable only. This plaintiff admits, and we will presume, that it would have been set aside upon motion and affidavit or petition if the court entering it had been applied to. This court has announced a most liberal rule in behalf of those who seek to challenge divorce decrees entered in fraud of the rights of the party defendant, or where the court has been imposed upon. *Anderson v. Burgoyne*, 60 Wash. 511, 111 Pac. 777; *Graham v. Graham*, 54 Wash. 70, 102 Pac. 891. Plaintiff had timely notice, and instead of availing herself of the remedies which the legislature had designed for her protection, or invoking the inherent power of the court, as suggested in the *Graham* case, she seemed willing to indorse the decree, provided Morgan agreed to pay a greater amount than the court had fixed for a family allowance; and this action is maintained, not so much because no service was had in the original act, as because Morgan has left the state and refused to keep that contract.

We cannot differentiate this case from that of *Tausick v. Tausick*, 52 Wash. 301, 100 Pac. 757. In that case it was urged that no jurisdiction had been obtained over the person of the plaintiff, and a collateral action was brought to enforce property rights. We said:

"It is not quite certain whether the theory of her complaint that the court did not acquire jurisdiction and that she was coerced into signing the deed to respondent's property, or the theory that runs in and out of her testimony for its whole length that she settled with respondent and allowed him to take a divorce upon the understanding that he would do the right thing by her in the way of a property settlement and future advances which he has failed to keep is the one upon which she most relies. . . . It indicates to our

minds that her dissatisfaction comes, not so much from the unauthorized appearance of her attorney, as from the fact that she believes her husband has not carried out his promise with reference to the settlement of money upon her after the decree was rendered. In other words, if respondent had met her demand subsequently made, the question of jurisdiction would have been admitted."

Plaintiff cannot, in a collateral proceeding, affirm the divorce decree in so far as it disposes of the marriage relation, and deny it in so far as it affects property. If the one finding is binding, the other is binding also. Good faith, as well as sound public policy, demands that erroneous and voidable judgments be set aside and modified in the courts in which they are rendered. If plaintiff desired to affirm the decree of divorce and litigate the order disposing of the property, she might have done so by either applying to the court granting it for a vacation and modification of its judgment, or by taking an appeal therefrom, if the record was in proper form to bring the facts here. She did neither, and within the logic of *Wilkinson v. Wilkinson*, 63 Wash. 126, 114 Pac. 915, and *State ex rel. Holcomb v. Yakey*, 48 Wash. 419, 93 Pac. 928, is estopped to proceed against strangers.

When plaintiff learned of the divorce, and voluntarily substituted her confidence in her recreant spouse, by entering into a contract referable to the decree, for the protecting arm of the law, she waived all right to challenge the return of the officer in any court other than the one in which the decree was rendered, or to recover damages against the surety in any collateral proceeding. The fallacy of plaintiff's position is at once apparent when we are called upon to state a rule of damages. If plaintiff were allowed to maintain this action, all that a court could say in directing the mind of the jury to the measure of damages is, that a divorce had been obtained; that no service on the defendant was had; though presently informed, defendant did not move against the de-

cree; that the court found that there was no community property; that the party charged with the payment of alimony met the requirements of the decree for a time, paying the family allowance and alimony as fixed by the court and by his subsequent contract; that finally he ceased to do so. This action has been begun and it is for you, gentlemen of the jury, to say what the judge sitting in the divorce case would or might have given in lieu of alimony or in addition to the amount he did fix, had defendant appeared and defended the action. It will require no argument to demonstrate the unsoundness of this position, and in passing, it is not out of place to say that the trial judge did not even attempt to submit a measure of damages, contenting himself with saying that the jury could find damages, if it found that plaintiff had been deprived of community property; in which event the jury might find a verdict in her favor for such sum as would compensate her for the wrongful act of the sheriff. If plaintiff desires to reopen the divorce case, she must apply to the proper court, subject, however, to the defenses that may have come by lapse of time. If she desires to sue for money which in law may be hers, she must wage an action against George W. Morgan.

The judgment of the lower court is not sustained in law, and this case is reversed with instructions to enter a judgment in favor of the defendant.

DUNBAR, C. J., CROW, MORRIS, and ELLIS, JJ., concur.