[No. 30074.   Department Two.   March 14, 1947.]

NELLIE L. LEE, *Respondent,* v. HAROLD B. LEE, *Appellant.*[1]

[1]Reported in 178 P. (2d) 296.

*John W. Brisky* and *Welts & Welts*, for appellant.

*Warren J. Gilbert* and *Alfred McBee*, for respondent.

STEINERT, J.—This is an appeal from that portion of an interlocutory order of divorce which, in addition to making a division of property between the parties, awarded to the plaintiff a substantial amount of money to be paid to her by the defendant.

Respondent, Nellie L. Lee, and appellant, Harold B. Lee, intermarried December 12, 1917. At the time of the trial herein, respondent was approximately fifty-one years of age, and the appellant fifty. Two children were born to the union, a son, Vernal, and a daughter, Marylin, both of whom are now well over twenty-one years of age and self-supporting.

At the time involved in this action, the parties owned a farm and other property in Skagit county of the total agreed value of twenty thousand eight hundred dollars. For purposes of convenient reference, the property is here listed, as of the agreed values as follows: a farm, together with a residence and other improvements, machinery, and the cattle on the place, all valued in the total sum of eighteen thousand dollars; household furniture in the residence, valued at fifteen hundred dollars; one-half acre of ground, which was a part of the farm but here considered separately, of the value of three hundred dollars; and a machinery combine valued at one thousand dollars.

The farm was maintained by the parties for the production and sale of milk and certain crops, principally vegetable seeds. In connection with the farm, they also had the use of approximately eighty-five acres of leased land, on which both spring and fall plantings were regularly made. They kept a joint bank account in the First National Bank of Mt. Vernon, in which the proceeds of the farm operations were deposited, in whole or in part. Both parties made deposits in and withdrawals from this account, although Mrs. Lee's

withdrawals were apparently small. Mr. Lee, who had charge of the farm operations, paid all the expenses incident thereto, either by check or cash.

For a long time prior to January, 1945, the parties to this action had engaged in violent quarrels with each other. Realizing that a divorce was inevitable, they discussed between themselves the matter of a separation and a property division. Appellant proposed to respondent a settlement which he was willing to make. Respondent consulted Mr. Warren Gilbert, an attorney in Mt. Vernon, telling him "what kind of deal she had made with Mr. Lee and wanting to discuss the advisability of it." Mr. Gilbert advised against it unless and until appellant should first make a sworn statement of everything he owned. Apparently, both Mrs. Lee and Mr. Gilbert were at that time particularly interested in the amount of the money returns from the farm operations during the preceding year, 1944. Mr. Lee refused to give such a statement, but at the trial testified that the demand and refusal were made not before, but sometime after, the written agreement, hereinafter referred to, had been consummated.

At any rate, on January 10, 1945, which was a Saturday, appellant and respondent, with their son Vernal, drove to Mt. Vernon, intending to go to Mr. Gilbert's office and there complete their settlement. The mother and son went directly to that office and waited for the appellant, who, in the meantime, was attending to some personal affairs. Appellant arrived at the office at ten minutes to twelve, just as Mrs. Lee and the son were leaving. Mr. Gilbert then discussed the matter briefly with the appellant alone and reiterated his demand for a sworn statement, which appellant declined to give. Mrs. Lee having left, nothing was accomplished on that occasion. According to the usual custom, Mr. Gilbert's office was closed on Saturday afternoons.

Later in the same afternoon, Mr. and Mrs. Lee again met and, being desirous of completing a settlement immediately, went to the office of Mr. John W. Brisky, another attorney in Mt. Vernon. The son accompanied them. None of the

Lees had previously known or transacted any business with Mr. Brisky.

It appears that one of the principal points of the proposed settlement involved an intended sale of the farm, certain equipment, and existing cattle to Vernal, the son. Mrs. Lee had previously expressed her desire that sale be made to the son at a price of fourteen thousand dollars. Mr. Lee was unwilling, however, to sell for less than eighteen thousand dollars.

After some heated discussion between the husband and wife with reference to the terms of settlement, Mr. Brisky prepared a real estate contract wherein Mr. and Mrs. Lee agreed to sell and Vernal Lee, their son, agreed to buy the farm with the appurtenances, less one-half acre in the northeast corner thereof, for the sum of eighteen thousand dollars, of which four thousand dollars was then and there to be paid, and the balance of fourteen thousand dollars was to be paid in annual installments of two thousand dollars on January 15th of each year, beginning in 1946. Of the full purchase price, Mrs. Lee was to receive eleven thousand dollars and Mr. Lee seven thousand dollars. The contract further provided that the sale and purchase should include "all personal property, stock, furniture, fixtures, and all other appurtenances now located on the above described premises" *except* the household goods and furniture, which were to be the sole and separate property of Mrs. Lee, and the combine, which was to be the sole and separate property of Mr. Lee. The proposed contract also recited that the one-half acre above mentioned was by proper conveyance to become the sole and separate property of Mrs. Lee, as soon as a more accurate description thereof could be obtained.

Upon preparation of the real estate contract, but before the parties had signed it, Mr. Lee insisted that Mrs. Lee execute to him a full release of any and all obligations other than as evidenced by the foregoing contract. This precipitated some further argument between the parties, but Mrs. Lee finally agreed to execute a release if she were paid an additional sum of five hundred dollars. Mr. Lee agreed to

this, and Mr. Brisky thereupon drew a release reading as follows:

"Jan. 10, 1945

"We the undersigned, Harold B. Lee and Nellie Lange Lee, being husband and wife, and being unable to get along and wishing to separate, and having arranged our property rights,

"Now THEREFORE, in consideration of $500.00 in hand paid by Harold B. Lee to Nellie Lange Lee, the receipt whereof is hereby acknowledged, each of said parties hereby releases and saves the other party from any and all obligations of any nature whatsoever, either past or present, it being the intention of the parties hereto that this instrument shall be a full and complete release and settlement of any and all separate and community obligations owed to either of the parties or to third parties."

The real estate contract was then signed and acknowledged by all the parties thereto, and the release was also signed by both the respondent and the appellant. At the same time, Vernal Lee was prepared to pay the initial sum of four thousand dollars. To compensate Mrs. Lee for the additional five hundred dollars which Mr. Lee had agreed to pay her, Vernal Lee was directed to evidence the down payment of four thousand dollars by drawing one check to Mrs. Lee in the sum of $2,250, and another to Mr. Lee in the sum of $1,750. It is apparent that this division of payment was erroneous, in that Mrs. Lee should have received a check for $2,500 and Mr. Lee one for $1,500. None of the persons then present seems to have detected the error at that time, but there is no dispute concerning it now.

At the completion of the transaction, the parties left Mr. Brisky's office. It is inferable from the evidence that Mrs. Lee was to continue her residence indefinitely in the house on the farm, at least until she could build on the one-half acre mentioned above. The son is unmarried, but whether he also now lives in the farmhouse is not entirely certain. It further appears that Mr. Lee had permission from the son to continue his residence there until he had harvested the 1945 crops, or until he could make other arrangements. The fact is that, although no reconciliation between the

parties has ever taken place, they both have continued their residence in the farmhouse, but have occupied different quarters therein. This arrangement has not been at all satisfactory to Mrs. Lee, but, on the contrary, has been a constant source of annoyance to her, and explains in part her attitude in the subsequent action for divorce.

At the time the settlement was made, it was apparently understood that, in the divorce action to be brought, Mrs. Lee would be represented by Mr. Gilbert, and Mr. Lee by Mr. Brisky; at any rate, each party consulted his or her own attorney on one or more subsequent occasions. However, when the action was brought in November, 1945, which was ten months after the settlement was made, the parties were represented by different attorneys entirely, as the record here reveals.

In the meantime, Mr. Lee harvested the 1945 crops under an arrangement with the son for equal division of the proceeds, and, in October of that year, he purchased another farm in the vicinity at a price of fifteen thousand dollars, paying four thousand dollars cash and giving notes and mortgages for the balance of eleven thousand dollars. The cash payment was derived from the $1,750 originally received from the son, plus $2,500 representing Mr. Lee's portion of the 1945 harvest from the land previously sold to Vernal.

In her complaint, filed November 13, 1945, Mrs. Lee sought a divorce on the ground of cruelty. She made no mention of the settlement of January 10, 1945, but alleged instead that the community property consisted of an interest amounting to fourteen thousand dollars in the real estate contract above described and an interest in growing and harvested crops, farm machinery, cash, and other personal property, the nature and extent of which were alleged to be unknown; she further alleged that appellant owned certain separate property, the nature and value of which he refused to divulge to her.

Appellant filed an answer and cross-complaint, likewise seeking a divorce on the ground of cruelty, and pleading the former settlement of all property rights of the parties.

In her reply, respondent admitted the execution of the release, but denied that it was a complete property settlement. She further alleged affirmatively that, at the time she signed that instrument, she was ignorant of the amount of property owned by the community; that a substantial amount of such property consisted of the proceeds from certain crops; and that appellant had procured her signature to the instrument by concealing from her the true facts. In her prayer, she asked that the terms of the real estate contract be ratified and confirmed, and that an equitable division of the remaining community property be made by the court.

At the trial, held in April, 1946, respondent was permitted to testify, over appellant's objection, that she misunderstood the purport of the release, and that, if she had understood that she was thereby relinquishing her interest in the proceeds of the milk and crops produced in the preceding year, 1944, she would not have signed that instrument.

Upon this theory of her case, respondent was permitted to introduce evidence that, during the year 1944, which was prior to the settlement, appellant had received from the sale of milk and seed a total sum of $12,417.07, but had deposited in the bank only $9,454.82, a deficit of $2,962.25.

In his testimony, appellant explained that, in conducting his farming operations over the past years, he was always under heavy expense for rentals, fertilizer, cultivation, harvesting, threshing, and payment of wages and board bills of his helpers, who sometimes numbered as high as thirty men; that many of the men stayed only for short periods of time, and that it was constantly necessary for him to keep a considerable amount of cash on hand to meet the immediate demands; and that for that reason he always retained in cash a certain portion of his receipts instead of depositing the entire amounts in the bank. According to his testimony, such cash payments in 1944 would easily amount to $2,962.25, being the amount above indicated as having been withheld from deposit.

In the course of his testimony, appellant produced copies of ledger sheets obtained from the bank, showing the state of the joint bank account from December 31, 1943, to December 29, 1944. These sheets, containing about two hundred items of deposits and withdrawals, showed that during that year about $9,500 had been deposited in the bank account and approximately an equal amount withdrawn therefrom during the same period. At the end of the year, the account was overdrawn in the sum of $22.98.

Upon cross-examination by respondent's counsel, appellant was unable readily to explain in detail what some of the items of receipts and expenditures, as shown by the ledger sheets, were for, but he did state that they were all in connection with the farming operations during that year; nor was he able at the moment to explain to the satisfaction of the court what had become of all the money derived from the farming operations in both 1944 and 1945.

At the conclusion of the trial, the court rendered an oral decision, the substance of which is contained in the following quotation therefrom:

"As Mr. McBee [respondent's attorney of record] has stated, there is approximately $18,000 of money that has been taken in here that has not been properly accounted for. And the court now is in a quandary as to what has become of that money. Some of it must have been paid out for rentals for the lease of these seed grounds— different leases of the seed grounds, and probably the feeding of the cattle, there is some expense to that. But just what that is there is nothing here to show the court what the cost is of that, or what the costs are of the labor that it took to harvest those crops. There has been a peculiar disappearance of some of the cattle. I think somebody said there were twenty-eight head of cattle, I forget how many. Their disappearance from the scene here has not been satisfactorily explained to the court. In the answers Mr. Lee made he was evasive. He did not know, or could not recollect, which in many instances I think is true, but in the main he could have been more helpful.

"I do not know that I said before just how this should be divided up. I think there should be a cash award for this lady [respondent]. I do not think it should be so they have to deal back and forth, I think whatever the court allows

her should be a cash award . . . I am inclined to give this lady an additional $3,000.00."

Thereafter, the court made findings to the effect that in 1944, prior to the settlement, appellant had taken in from all sources amounts totaling $15,683.74; that in 1945, subsequent to the settlement, he had taken in from like sources a total of $3,881.60, making a grand total of $19,565.34; that, of the amount received in 1944, he had deposited in the bank only $9,525.72, the greater part of which had been later withdrawn by him; that appellant had not satisfactorily explained to the court what disposition he had made of the money representing the difference between the amount received and the amount deposited; that the release given by the respondent in January, 1945, was without consideration and should be canceled; and that respondent should be awarded an additional sum of $3,000.

The trial court seems to have rested its decision upon two separate, but intermingled, grounds: (1) that appellant had not accounted for the sum of $2,957.25 withheld from deposit in 1944; and (2) that he had not satisfactorily explained his disposition of the receipts in both 1944 and 1945, before and after the settlement, amounting to $19,565.34.

The sole question involved upon the appeal is whether the trial court made a just and equitable division of the property belonging to the litigant parties.

We will consider the matter, first, from the viewpoint of the settlement which the parties made between themselves.

The evidence is without dispute that appellant made an offer of settlement whereby the farm was to be sold to the son, Vernal Lee, for eighteen thousand dollars, of which amount respondent was to receive eleven thousand dollars in full settlement of all her property rights. On several occasions before the settlement was made, respondent consulted Mr. Warren Gilbert, her own attorney, with reference to the "kind of deal she had made with Mr. Lee." The attorney advised against it unless Mr. Lee should give a sworn statement of his receipts for milk and seed. Mr. Gilbert's testimony with reference to the situation as it existed prior to the settlement was as follows:

"A. I asked Mr. Lee to disclose to me the sum total and extent of all the property he owned, and I told him that Mrs. Lee had come to me about deeding the farm and property over to the boy for an agreed price, and had stated to me the terms upon which she wished to do it, which was an uneven distribution. I cannot say that $11,000.00 was the exact amount at that time, except it was an unequal division of the purchase price. I told him that Mrs. Lee had told me that she wanted to make a property settlement agreement between them, and told him that she had told me that he had offered her this particular amount of the purchase price of the farm in full settlement of all of her rights, and I told Mr. Lee that I wanted to know from him what property he owned in addition to the farm, that I understood from Mrs. Lee that he had some money coming from seed contracts, that I understood it was his habit to carry considerable money in his pocket that he did not bank. I wanted an accounting of his milk checks and asked him if he would make a statement to me, and he said he would not do so. Q. What did you do with reference to the preparation of a contract? A. I told Mr. Lee I would not make a property settlement agreement between them unless he made a full disclosure of everything, and he had to do it under oath and swear to it."

It is thus clearly apparent that Mr. Lee's offer to give Mrs. Lee eleven thousand dollars of the sale price of the farm, while he should have but seven thousand dollars, was to be in full settlement of all property rights; that Mrs. Lee, as well as her counsel, definitely understood the offer; and that both of them knew that Mr. Lee would make no settlement which involved the payment of any additional sum based on what the receipts for the past year had been. At the time Mrs. Lee left Mr. Gilbert's office and later, when she went with the appellant to the office of Mr. Brisky, she was fully aware of the terms and extent of appellant's offer. At the latter office, the matter was again discussed, with the result that Mr. Lee agreed to give her five hundred dollars additional for a release upon the terms of his offer. She took the benefit of the offer by signing the contract which gave her an eleven-thousand-dollar interest in the real estate contract, besides a reservation of one-half acre of ground, valued at three hundred dollars, all the furniture

in the house, valued at fifteen hundred dollars, and what amounted to two hundred fifty dollars of the five hundred dollars which appellant agreed to pay in addition.

At the trial fifteen months later, however, she claimed that she had not understood the terms of settlement. She there testified:

"I understood it that I was to give a release, which I was very glad to do, and also to let him have whatever he made from then on; but I would never have signed no paper like that if I understood that I was signing away my one-half interest in the crops the year before, which I had worked very hard for during those months, cooking for his hired help. . . .

"Q. [On cross-examination] And you said to the court that you were perfectly willing to give him a release so that the next year's crops and what he made from thereon was his, but that you did not understand that this was to cover the cash received in 1944 from the 1944 seed crop, am I right? A. That is right. Q. So that the thing that you now say you did not understand and did not think the release included, was the matter of the cash received in 1944 for the crops and milk sold that year? A. I did not understand that it covered that at all. Q. But as to the rest of it, you understood that? A. That is why I signed it, with that understanding."

The son, Vernal Lee, when interrogated as to the discussions between his father and mother, both at home and in Mr. Brisky's office, with reference to the settlement, testified:

"Q. State, if you know, what the agreement was? A. As I was going to say before, word for word I couldn't relate it. At the time I understood it was to be a settlement; since then things have changed. Q. A settlement by which Mother had what, and Dad had what? A. Supposed to have been a complete settlement on what their business relations were at that time. . , . Q. From the discussion do you know who was to go on and conduct those farming operations and harvest those unplanted crops? A. That was part of his work. Q. Do you know who was to pay the bills for those crops as they were harvested, and have the returns? A. Naturally, that was his dealings, and it was to be his as far as I understood."

Mr. Brisky, who drew the two instruments, testified as to what took place in his office, as follows:

"They came in, and just in general terms stated they were not able to get along and they wanted to divide their property and sell it to Vernal. It came to the question of how the amounts were to be paid. Mrs. Lee was to get $4,000.00 more than Mr. Lee because of the fact that there were certain seed crops growing which he was willing to assume, and they might amount to something and they might not; and we attempted to make a complete settlement at that time. Both of them so desired."

As a general rule, voluntary settlements of property rights are binding on the parties and will be upheld if they are fair and equitable, untainted with fraud, collusion, coercion, undue influence, or the like, although, in subsequent actions for divorce, such settlements or agreements are not binding on the court and may be disregarded if the court is satisfied that they are unfair, unjust, or do not constitute a proper division of the property. *Tausick v. Tausick,* 52 Wash. 301, 100 Pac. 757; *Malan v. Malan,* 148 Wash. 537, 269 Pac. 836; *State ex rel. Atkins v. Superior Court,* 1 Wn. (2d) 677, 97 P. (2d) 139; 27 C. J. S. 1157, Divorce, § 301.

Bearing in mind the fact that, at and prior to the time the property settlement was entered into, the very matter here in dispute had been fully and frequently discussed and legal advice obtained thereon by respondent, it cannot rightly be said that any fraud, collusion, coercion, or undue influence was exerted upon her. Moreover, it is clear that the greater proportion of interest in the real estate contract, which she was to receive, plus the additional five hundred dollars, was in consideration of her release of all other claims that she might have against appellant. Under these circumstances, the only question which now remains is whether, in any and all events, the settlement was fair, just, and equitable. This brings us to the second point of view in the case.

The trial court seems to have been largely influenced by the showing of the amount of money that had been collected by the appellant from all sources during the years

1944 *and 1945,* and to have based its award to the respondent solely upon that circumstance. With respect to that conclusion, several things may be said: First, respondent's claim, as shown by her evidence quoted above, was simply for an accounting and share of the 1944 receipts for milk and seeds, not for any portion of the receipts during 1945; she conceded that her understanding of the release was that it covered everything except "cash received in 1944 for the crops and milk sold that year." This would at once eliminate $3,881.60 from the amount considered by the trial court, leaving $15,683.74 alleged to be unaccounted for. Second, of the latter amount, not more than $14,000 was for milk and seed produced in that year. Third, it must be remembered that these figures, including the last one given, were gross amounts. As against the latter amount would have to be charged the expenses of operation during the entire year. One item alone was the purchase of the combine for $1,289. Then, as the court remarked in its oral decision, there were the rentals for the leased ground, the feed for cattle, and the cost of labor for growing and harvesting the crops. In addition to that, the living expenses of the family during the year would have to be taken into consideration, for those expenses would also have to be paid out of the total receipts. What all these items of expense would amount to we do not know, for the record does not supply the information. It is safe to assume, however, that when those items are deducted, it would leave an amount no greater than the differential of four thousand dollars which was to go to the respondent out of the real estate contract with the son.

While we recognize the well-established rule that in such matters the trial court has a wide discretion, we are fully convinced that the settlement voluntarily made between the parties was a just and equitable one, and that to upset it at this late day, upon the contentions made by the respondent, would be unjust and inequitable as to the appellant.

In this connection, it should be stated that appellant still owes the respondent the sum of two hundred fifty dollars, the balance of the additional amount agreed to be paid by

him to her, and he will be required to make payment of that amount.

■ Another matter to which we wish to refer relates to the farm which appellant purchased subsequent to the separation and settlement agreement, with funds in which respondent has no present interest. Since that land was specifically referred to in the trial court's findings, the interlocutory order should confirm title thereto in appellant.

Finally, as indicated in the early part of this opinion, respondent is residing in the farmhouse on the land sold to the son, and maintains there the furniture which was awarded to her. Appellant also is, or at the time of the trial was, maintaining living quarters in the same house, much to the annoyance of the respondent. We can readily see how such a situation would be productive of continued turmoil and bickering, as an outgrowth of this litigation. Appellant has a place of abode on the land which he has since purchased, and should be required to leave, and stay away from, the house occupied by the respondent, and the trial court is hereby directed to incorporate such provision in the interlocutory order to be entered.

The interlocutory order heretofore entered by the trial court is reversed, with direction to enter in its stead an order consistent with the views herein expressed.

MALLERY, C. J., ROBINSON, JEFFERS, and HILL, JJ., concur.