[No. 29646. Department One. August 23, 1945.]

CYNTHIA WALKER, by her Guardian, ROY E. CAREY, Appellant, v. RUSSELL SIEG et al., Respondents.[1]

[1]Reported in 161 P. (2d) 542.

W. E. *Southard,* for appellant.

T. B. *Southard* and W. M. *Clapp,* for respondents.

JEFFERS, J.—This action was originally commenced by Roy E. Carey, as attorney in fact for Cynthia Walker, against Russell Sieg and Chloie Sieg, his wife, sometime in February, 1943. The purpose of the action was to recover the balance claimed to be due Cynthia Walker from the Siegs upon a promissory note made and executed by Mr. and Mrs. Sieg in favor of W. M. Walker, husband of Cynthia Walker. The note, dated December 1, 1924, is for forty-five hundred dollars. It became due, according to its terms, three years after date and bears interest at the rate of eight per cent per annum from date until paid. On the back of the note are the following endorsements:

"Feb. 13, 1926. Recd. payment of $1,016.55 on this note.
"June 8, 1926. Recd. Payment of $52.60 on this note.
"Credit. Oct. 1928, $19.35.
"Credit. Dec. 1929, $100.00.
"Credit. Dec. 1930, $50.00.
"Nov. 1932, credit, $100.00.
"Sept. 1933, credit, $50.00.
"Oct. 1934, recd. for credit, $50.00.
"December 1935, credit, $50.00.
"September 1936, credit, $50.00.
"Nov. 1937, recd. on note, $50.00."

It is alleged in the complaint that since the execution and delivery of the note, W. M. Walker died, and that Cynthia Walker is now the sole owner of the note; that no payments have been made on the note, except those shown by the above endorsements; and that there is now due and owing from defendants the sum of $11,753. Attached to the complaint as exhibit A is a general power of attorney, signed by Cynthia Walker on May 13, 1941, sworn to before a notary public on May 14, 1941, and filed May 19, 1941.

August 2, 1943, plaintiff filed a motion for default against defendants for failure to answer the complaint. The affidavit in support of the motion states that on April 27, 1943, defendants' demurrer to the complaint and their motion directed against the complaint came on for hearing, and the court overruled the demurrer and struck all of paragraph 2 of the complaint after the allegation that defendants were husband and wife; that more than two

months have elapsed and defendants have not answered the complaint.

The order or orders of the trial court overruling the demurrer and granting defendants' motion are not before us, so we do not know what they contained or when they were filed, other than as above indicated.

On August 10, 1943, defendants filed an answer, in which they admitted that they were husband and wife; admitted the execution and delivery of the note; admitted that Cynthia Walker was the wife of W. M. Walker; admitted the payments endorsed on the note, including the payment made in November, 1932; denied that any other or further payments were ever made on the note by defendants; and denied that there is any amount now due and owing on the note from defendants to plaintiff.

The answer also contains two affirmative defenses with which, in view of the questions raised on this appeal, we are not concerned, except that in the first affirmative defense it is alleged that at the time this action was commenced there was another action pending in the superior court for Grant county, wherein it was sought to have a guardian appointed for Cynthia Walker, which action was still pending and undisposed of.

September 10, 1943, plaintiff filed a reply, in which it is stated that the proceeding to have a guardian appointed for Cynthia Walker has not been disposed of because of the inaction of those who asked that such a guardian be appointed. The reply denies the other affirmative matter set up in the answer.

November 26, 1943, plaintiff filed a motion asking that Roy E. Carey, as guardian of the estate of Cynthia Walker, be substituted as party plaintiff for Cynthia Walker, by her attorney in fact, Roy E. Carey. It is stated in the motion that since this action was commenced, Roy E. Carey has been duly appointed guardian of the estate of Cynthia Walker.

December 18, 1943, the court made an order authorizing the above substitution, which order was filed December 20, 1943. The record before us does not show when the

court made and entered the order appointing Roy Carey guardian of Mrs. Walker. We assume it was probably not until after defendants had filed their answer on August 10, 1943, calling attention to the fact that such a proceeding was pending.

February 5, 1944, defendants filed an amended answer, and it is in regard to an affirmative defense set up in this amended answer that we are concerned in the first assignment of error, to which we shall later refer. By this amended answer, defendants admit that they are husband and wife; admit the execution and delivery of the note; admit that Cynthia Walker is the sole owner of the note; admit the payments endorsed on the note down to and including the payment in November, 1932; deny that any other payments were made on the note by defendants; and deny that there is anything now due and owing on such note from defendants to plaintiff.

This answer contains three affirmative defenses. We are concerned herein with only the second, in which it is alleged that no payments upon the note were made to Cynthia Walker, or anyone in her behalf, after the year 1932, and by reason of the failure to make such payments the action is barred by the statute of limitations.

On the same day the amended answer was filed, plaintiff filed a motion to strike the amended answer, for the reasons that the answer was filed without leave of court and for the purpose of delaying the action, and that if the amended answer was permitted to stand it would work great injury to plaintiff, because since the commencement of the action Cynthia Walker had become adjudged mentally incompetent and thereby barred from testifying in the action.

May 25, 1944, an order was filed, which recites in part that the motion to strike the affirmative defenses in the amended answer came on for hearing on February 8th; that the third affirmative defense be stricken; that the second affirmative defense setting up the statute of limitations be allowed to stand, as well as the first affirmative defense.

The cause came on for hearing before the court on July 14, 1944.

October 23, 1944, the trial court filed a memorandum opinion, which concludes as follows:

"When reliance is placed upon a part payment to remove the bar of the statute and payment is denied, the burden of proving the payment within the statutory time rests upon the party asserting it. It is the fact of partial payment, and not the formal entry of credit, which tolls the statute.

"It is my opinion that the plaintiff has failed to sustain the burden of proof necessary to establish *any payments made by Mr. Sieg on this note subsequent to 1935,* and that therefore judgment should be for the defendants." (Italics ours.)

On March 8, 1945, the court made and entered findings of fact, from which it concluded that Cynthia Walker was the owner and holder of the note; that no payments had been made thereon since December, 1935, and that by reason thereof any action on the note was barred by the statute of limitations; and that the action should be dismissed. Judgment was entered accordingly. Plaintiff has appealed from the judgment entered, and was authorized by the trial court to expend funds of the ward necessary to perfect such appeal to this court.

The assignments of error are: (1) In permitting the respondents to amend their answer in which the statute of limitations was pleaded affirmatively; (2) in permitting the respondents to testify to transactions had with appellant, an incompetent person; (3) in holding that the evidence introduced by appellant was insufficient to establish all payments endorsed on the note; (4) in holding that the testimony of the guardian opened the door to permit the respondents to testify as to transactions had with Mrs. Walker; and (5) in entering judgment of dismissal.

Before discussing the assignments of error and the particular facts pertaining thereto, we shall make a brief general statement in regard to the parties to this action.

Roy Carey has lived in Hartline and that vicinity for twenty-five or thirty years and is a son-in-law of Cynthia

Walker. While Mrs. Walker has a home of her own in Hartline, she has lived with Mr. and Mrs. Carey for the past five years. Mr. Carey drew the note involved in this action and made all the endorsements appearing thereon, at the request of Cynthia Walker. Mrs. Walker was past eighty years of age at the time of this hearing. In addition to her home in Hartline, she owned considerable farm property near Hartline.

Respondent Russell Sieg is also a son-in-law of Mrs. Walker and has occupied and farmed some of Mrs. Walker's land since 1918. In addition to Mrs. Sieg and Mrs. Carey, Mrs. Walker has two other daughters, Mrs. Gertrude Boland, of Yakima, and Mrs. Ivy Pincen, who lives on a ranch near Hartline. So far as the record shows, the most friendly feeling exists, at least between Mrs. Sieg, Mrs. Boland, and Mrs. Pincen. We may say further that we do not believe any witness attempted to testify to facts other than as they believed them to be.

With the above general statement, we shall now discuss the first assignment of error, namely, that the court erred in permitting respondents to plead the statute of limitations in their amended answer.

Appellant first called attention to Rule 6, Rules of Practice, 18 Wn. (2d) 34-a, effective March 2, 1944, and particularly stresses that part of subdivision 2 of the rule which provides:

"But the order or leave [to amend] shall be refused if it appears to the court (a) that the motion was made with intent to delay the action, or (b) that the motion was occasioned by lack of diligence on the part of the moving party and the granting of the motion would unduly delay the action or embarrass any other party, or (c) that, for any other reason, the granting of the motion would be unjust."

■ We think it must be admitted that great latitude in permitting the amendment of pleadings is vested in the trial court by Rule 6, and this court, as well as others, has been liberal in construing the powers so vested. We need only call attention to the case of *Thomas v. Price*, 33 Wash.

459, 74 Pac. 563, 99 Am. St. 961, wherein during the trial of the case the court permitted the plaintiffs to amend their reply by pleading the statute of limitations against a note set out in the cross-complaint.

■ We are convinced that in the instant case the trial court did not abuse the discretion vested in it in permitting the statute of limitations to be pleaded affirmatively in the amended answer. We are of the opinion that it does not appear from the record that appellant was prejudiced by the court's action, nor does it appear that the amended answer was filed for the purpose of delaying, or that it did unduly delay, the trial of the cause.

It is quite apparent from the record that none of the parties was as diligent as he might have been. We base this statement upon the filing dates of the respective pleadings. It is also apparent that at the time respondents filed their original answer, an action was pending to have a guardian appointed for Mrs. Walker, of which we assume appellant had knowledge. It is also apparent from the record that sometime after the action was commenced, just when we do not know, a hearing must have been had and Mr. Carey appointed guardian of Mrs. Walker; that it was not until November, 1943, that appellant asked to have the guardian substituted as party plaintiff for Mr. Carey as attorney in fact for Mrs. Walker; and that the order of substitution was not made until December 18, 1943. It also appears that the amended answer was signed on January 10, 1944, although not filed until February 5th. When this answer was served does not appear. We also call attention to the fact that respondents in their original answer denied that any payments had been made by them on the note in question subsequent to November, 1932. It must then have been apparent to appellant that the burden would be on her to establish that the payments endorsed on the note subsequent to 1932 were in fact made by respondents. From the testimony of Mr. Carey and other witnesses, we are convinced that it is doubtful if Mrs. Walker would have been able to testify in this case at any time after the action was instituted.

For the reasons assigned, we conclude the trial court did not err in permitting the amended answer to stand.

We desire to next discuss assignment of error No. 3, which is that the court erred in holding the evidence adduced by appellant was insufficient to establish all payments endorsed on the note.

There can be no question but that any action on the note is barred by the six-year statute of limitations, unless appellant has established that respondents actually made a payment on the note in 1937, as the last payment claimed to have been made prior to the 1937 payment was in September, 1936, and this action was not commenced until February, 1943.

■ ■ Before discussing the testimony relative to the question before us, we desire to state some well-recognized principles applicable to the facts herein.

In *Pinnell v. Copps,* 149 Wash. 578, 271 Pac. 882, we stated:

"This court has consistently held, ever since the rendition of the decision in the case of *Morgan v. Morgan,* 10 Wash. 99, 38 Pac. 1054, that the defense of the statute of limitations is not unconscionable, but is entitled to the same consideration as any other defense. As was said in the case of *Arthur & Co. v. Burke,* 83 Wash. 690, 145 Pac. 974:

" 'The statute is a legislative declaration of public policy which the courts can do no less than respect.'

"In the same opinion, referring to the matter of the tolling of the statute by a payment on account, the court says:

" 'It is also a settled law of this state, following the trend of authority in others, that in order to toll the statute of limitations, the partial payment must have been a voluntary payment made or authorized or ratified by the party against whom the payment is invoked as tolling the statute.' "

We further stated in the *Pinnell* case:

"It is undoubtedly the law that in order for a delivery of money, property or credit by a debtor to his creditor to toll the statute of limitations, as constituting a payment on account, the act relied upon as such *must be intended by the debtor as a payment on account of an indebtedness or legal obligation, and not as a gift.*" (Italics ours.)

To escape the bar of the statute in the cited case, the respondent relied on the fact that certain articles of furniture were purchased by Dennis Curran and delivered to the respondent, and it was claimed by respondent that the delivery of this furniture to him constituted a payment by Mr. Curran on account of the indebtedness claimed by respondent.

In the instant case, the claimed payments were in the form of produce raised and produced by respondents on the farm and supplied to their mother.

In *Stockdale v. Horlacher,* 189 Wash. 264, 64 P. (2d) 1015, we again stated:

"Where reliance is placed upon a part payment to remove the bars of the statute, the burden of proving the payment within the statutory period rests upon the party asserting it. *Arthur & Co. v. Burke,* 83 Wash. 690, 145 Pac. 974. Where circumstances are relied upon to toll the running of the statute of limitations, *they must show a clear and unequivocal intention on the part of the obligor to keep alive the debt. Berteloot v. Remillard,* 130 Wash. 587, 228 Pac. 690; *Abrahamson v. Paysse,* 159 Wash. 516, 293 Pac. 985. Detached and fragmentary statements, susceptible of different interpretations, are not sufficient to remove the bar of the statute. *Bank of Montreal v. Guse,* 51 Wash. 365, 98 Pac. 1127." (Italics ours.)

The latest case called to our attention, wherein the question before us was discussed, is *Cannavina v. Poston,* 13 Wn. (2d) 182, 124 P. (2d) 787, and therein we find this statement:

"It may be admitted that, when reliance is placed upon a part payment to remove the bar of the statute [of limitations], *and payment is denied,* the burden of proving the payment within the statutory time rests upon the party asserting it. It is the *fact of partial payment, and not the formal entry of credit, which tolls the statute.* Creditors will not be permitted to defeat the statute by making belated credits. *Arthur & Co. v. Burke,* 83 Wash. 690, 145 Pac. 974. The endorsement, by the holder of a note, of a payment thereon is not competent evidence of the true date of payment, so as to take it out of the operation of the statute. *Arthur & Co. v. Burke, supra.*" (Italics ours.)

We desire to make one further quotation from the case of *Arthur & Co. v. Burke,* 83 Wash. 690, 145 Pac. 974:

"The rationale of these principles is this: the payment must be made under such circumstances as to show an intentional acknowledgment by the debtor of his liability for the whole debt as of the date of payment, from which arises a new implied promise, supported by the original consideration, to pay the residue."

Having in mind the above rules as to the burden of proof and the conditions which must appear before it can be said that a claimed part payment tolled the statute of limitations, let us examine the evidence introduced by appellant, and see whether or not such evidence was sufficient to establish that respondents made a payment on the note involved in this action in either 1936 or 1937.

Roy Carey was the only witness called by appellant. He testified that his only interest in the action was as guardian of Mrs. Walker's estate. The witness identified the note in question as having been drawn by him, and stated that all the endorsements appearing on the back of the note were made by him at the request of Mrs. Walker and at the time indicated by such endorsements.

Counsel for respondents objected to the introduction of the note, in so far as the endorsements on the back were concerned, for the reasons that there had been no proof of their having been properly made, and no evidence of any payments having been made at any time by respondents. We assume this objection was intended to apply only to the payments claimed to have been made subsequent to November, 1932, as the answer admits the payments endorsed on the note down to and including the date last mentioned.

After some colloquy between court and counsel, Mr. Southard continued the examination:

"Q. Where was Mrs. Walker living up until 5 years ago? A. She had her house in Hartline and lived in it by herself and kept up her own home. Q. During those years, did she have you do her business and keep it up for her. . . . A. *Mrs. Walker attended to her own business;* I didn't attempt to influence her in what she did. She had very little

education, but she did have a remarkable memory and a good business head. She had me do her figuring for her—things of that nature she couldn't do so readily. Q. Do you know what her condition was from 1932 on, including 1937, financially? What she took in a year, what she got and what she did with it? A. During those years she was pretty hard up. About all the revenue from the farm she would try to turn in on the debt on the place, paying the taxes, interest and insurance, and she would have very little to live on herself. . . . Q. Do you know—you had helped her—do you know how much she got for the rent? A. I knew each year, from year to year. W. M. CLAPP. If it may please the court, I want to know whether this is something Mrs. Walker told him, or did he know? A. It is not hearsay. She would have me figure up the amounts and the tickets, but she wrote all the checks, and things like that, herself. . . . Q. During those years, do you know if the defendants in this case rendered her assistance and helped Mrs. Walker, independently of the rent? W. M. CLAPP. I can't see the materiality of it at the present time. THE COURT. What is the purpose of this question? W. E. SOUTHARD. The purpose of that question, your Honor, is that I expect to show by this witness that she applied all her rent money on the taxes and mortgage, and she would have had to have some assistance besides that, and this witness knows the defendants did furnish her supplies and money enough to pay for her groceries—coffee, sugar and clothes and whatever she needed to get out of the grocery store; showing that the source therefor was received from them—the sums endorsed on this note. THE COURT. If these sums were given by the defendants as support money to their mother, then those particular sums couldn't be applied as payment on the note. In other words, if the purpose of these particular payments was to assist the mother in getting along, then those payments couldn't be applied and endorsed on the back of the note as payments." (Italics ours.)

After some further colloquy between court and counsel, Mr. Southard continued the examination.

"Q. Now, then, did you make these last 5 entries under instructions from Mrs. Walker, as the previous ones were made? W. M. CLAPP. We object. There must be testimony that these defendants paid this money for this particular purpose. All this witness knows, I take it, from his

statement, is that Mrs. Walker came and asked him to make the endorsements on the note of certain amounts of money. . . . THE COURT. I can't tell from the testimony up to the present time, just what the proof is. I believe I will let the plaintiff continue with the testimony, and I may have to decide after that."

Before obtaining an answer to the last question, Mr. Southard continued:

"Q. Can you say, of your own knowledge, whether or not her condition was such at that time; or what you know about the whole deal, as to whether or not she would have had to have money from them to get along?"

Objection by Mr. Clapp was overruled.

"A. As I said before, she had very little money, and all she had from the proceeds of the farm she applied on the debt to the Holland Bank, interest, etc., and she was hard up. She scarcely ate enough if we didn't make her. Q. Now then, you know they were furnishing her supplies and had to furnish her money to get along on in the store; I mean, to be able to pay her bills and buy goods, she would have to have money, aside from the rent, to do that?"

An objection was made to the last question, and some discussion was had between court and counsel.

"THE COURT. Mr. Southard, do you have any objection to having the witness testify to these particular transactions? The witness testified that he made these entries. Do you have any objection to his testifying as to the particular circumstances of making these entries? W. E. SOUTHARD. No. Q. Was there any difference, or any particular circumstances relative to the making of these entries, other than the other entries?"

Objection by Mr. Clapp was overruled.

"Q. Looking at this note, Mr. Carey—try to look at that and tell on what date the last 5 credits were entered. You can only tell the month. . . . A. In September, 1933, Mrs. Walker stated to me she had received produce and supplies from the Siegs and would credit the note, and asked me to make a credit of $50.00 on the note. W. M. CLAPP. This seems to me to be hearsay testimony. What Mrs. Walker told him. There is no time given, or anything. THE COURT. I think that I will admit the witness's testi-

mony. It was in September, 1933, that Mrs. Walker requested him to make this endorsement of this payment on the note, and I will strike the rest of his testimony concerning conversations she had had with the defendants; Q. Did she make the same, or practically the same, statements in regard to the other entries? A. Each year she would make down a note of the things received during the year, *and each fall she would ask me to put down the amount of this on this note.* Q. Did you learn, from any source, that it was the understanding with her and with the defendants, that she would give them the credits? A. *She had stated* she told the defendants she was giving them the credit." (Italics ours.)

Motion by Mr. Clapp to strike the answer as hearsay was granted.

"Q. All right. After you were appointed attorney in fact for Mrs. Walker, did you have any talk with them about paying this note? A. I had no interest in the note up until that time. No responsibility for it. Q. After you were appointed? A. After I was appointed, I saw the note was about to expire; that is, the limitation on the payments was almost 6 years from the last payment, and I thought it was my duty to do something about that. Q. Did you talk to them about it? A. I don't believe I did; I don't remember any special conversation. . . . Q. Did he ever make any claim that the note was outlawed? (Not answered. No ruling.) Q. Did he admit to you, after this suit was started, that this note had not been paid? (Not answered. No ruling.)

"Q. When was the first time, if you can give the court any idea, that they made the claim that these credits were not rightly entered, or that they made any such payments, or anything of that sort? . . . A. I can't remember any specific date where I did have a conversation. Q. Not a specific date, but you can probably get close to it. Can you tell the court when they made the claim that they never made these payments—the first time? Was it in this suit or independent of this suit, or at another time? A. During the years when Mrs. Walker was receiving things from the defendants, and *she said she was giving them credit,* and they didn't object—they didn't make any objection. Q. In their presence? A. Mrs. Walker *said* they made this arrangement. Q. Was that in their presence? A. It was generally known all along that she was giving this credit.

Q. The question is this: Did she state to them, in your presence, that she was giving them the credit? . . . A. Yes, once each year, when Mr. Sieg and Mrs. Walker settled the business I was generally present, and the tickets he turned over would be received by her, she would apply certain produce and chicken feed and such—and she would say, 'I will give you credit on your note.' Q. Did they make any objection? A. I didn't hear any. . . . Q. Now, then, Mr. Carey, taking 1934—you testified as to 1933—did you have a settlement then? A. We did. Q. Did you have a conversation like the year 1933? . . . A. Mrs. Walker always stated she would give them credit for produce and supplies brought in during the year. . . . Q. Taking December, 1935— W. M. CLAPP. This must be more specific— who was there and what happened. . . . Q. Coming to September, 1936, state what happened then. No. in 1935. Were you there when they made the settlement? A. It was the same procedure each year. T. B. SOUTHARD [Counsel for respondents]. Were you present at that time? A. At the time this endorsement was written? *Right at that time it was Mrs. Walker would bring the note to me, and ask me to write the endorsements and enter the figures, and I would make the endorsements.* T. B. SOUTHARD [Counsel for respondents]. That was not the time of the settlement? A. What settlement? W. E. SOUTHARD. Getting to 1935. They had a settlement. Was that the time the endorsement was made, or not? A. *Probably that time, but not every time.* Q. But are you sure at that time? A. I wouldn't say. Q. Were you present in 1935 when this endorsement was made? And who else was present? A. Mrs. Walker and myself, I know, *and I don't know whether anyone else was present or not.* Q. Were you present in 1935 when the settlement was made? A. That which you are referring to—when Mr. Sieg was there? A. Yes, and who else? A. Mrs. Walker and myself, in my home. . . . Q. We come to 1936. This is a credit in September in 1936. Were you present when they had the settlement? A. *I don't believe so. I won't say for certain.* . . . Q. Talking about 1936, were you present when the settlement was made between them and Mrs. Walker? A. 'Settlement' is rather confusing. Q. I mean, when they were talking over their settlement; were you present? A. *The endorsements were not all made at the time they made their settlement, and I was not always present then.* About the endorsements—I made them. . . . Q. Still referring to Septem-

ber, 1936. I will ask you to state whether or not, with reference to the credit to be given on the note in 1936, if Mrs. Walker stated to the defendants, or either of them, in your presence, the credit on the note of $50.00 for that year was to be given?" (Italics ours.)

After some colloquy between court and counsel, W. E. Southard asked the following question:

"Q. Do you remember whether you were present, Mr. Carey, when the settlement was made, or at any time during 1936, prior to entering the notation on the note, when a conversation was had between Mrs. Walker and the defendants, or either of them, with reference to a credit to be given on the note? A. My answer would be no. Q. You don't remember. With reference to 1937. Were you present when settlement was made in 1937? A. At the time this endorsement was put on? Q. No, before that. A. I was confused about that. Q. Did they have a settlement before these endorsements were made? A. *I can't testify as to the settlement.* Q. Were there any settlements made, in your presence, prior to these endorsements? A. *I can only remember 1935,* when we were all together, that Mr. Sieg would take certain tickets to the warehouse, and Mrs. Walker—Mr. Sieg would take the tickets to the warehouse and Mr. Higgins would bring them to me. Q. You testified a while ago to what Mrs. Walker said to them—that she was going to give them credit. When was that? A. It was in 1935." (Italics ours.)

The witness further testified that Mrs. Walker kept in a little book an account of everything that was provided her; that he had not examined this book, and did not know whether the amounts Mrs. Walker asked him to credit on the note were taken from this book or from memory. The book was not in evidence, and the witness did not know where it was.

On cross-examination, the witness stated that he relied on Mrs. Walker's statements that payments were made on the note. The witness was asked:

"Q. All you did was to endorse on the note what she told you to put on it? A. That is what I did, I don't know whether it covered it all or not. . . . Q. Here is September, 1933; do you know when the payment was made, or was that just her statement to you? A. Those payments

568

were for produce deliveries made at different times throughout the year. Q. This was all produce these people brought in and gave to their mother? I wouldn't say just what, I presume it was. . . . Q. But you were not present when any of those payments were made, if they were made? A. I have explained before, those were accumulated items throughout the year. Q. Yes, and sometime in the fall she would come to you and tell you to put a credit on for so much? A. Yes. Q. And that is all you know about it? A. Yes, that is all I know about it."

On redirect examination the witness was asked:

"Q. Has this note been paid, or any payments made, other than those endorsements? A. Not that I know of. Q. How long have you had the note in your possession? A. Well, it has been in my possession—or in the possession of the attorneys ever since I was appointed guardian. Q. Didn't you have the note? A. No. Mrs. Walker had the note as long as she was living by herself."

Because of the manner in which the questions were propounded and the answers given, we felt that it was necessary to set out Mr. Carey's testimony by question and answer rather than in narrative form, in order that a reader of this opinion could get the real effect of his testimony.

Appellant rested at the close of Mr. Carey's testimony. Respondents moved for a nonsuit, and, as appears from the statement of facts, cited *Pinnell v. Copps,* 149 Wash. 578, 271 Pac. 882, *Cannavina v. Poston,* 13 Wn. (2d) 182, 124 P. (2d) 787, and other authority to sustain their motion. The court denied the motion, with this comment:

"I don't see how you [appellant] can get away from that decision . . . 13 Wn. (2d), but I think I will deny the motion at this time."

■ It is our opinion that Mr. Carey's testimony fails entirely to show that any payments were voluntarily made by respondents on the note in question either in 1936 or 1937. Mr. Carey's testimony was that he was not present in either 1936 or 1937 when the settlement was made between Mrs. Walker and respondents, and that all he knew about these settlements was what Mrs. Walker told him; that in so far as the amounts endorsed on the note in 1936

and 1937 are concerned, Mrs. Walker came to him and told him the amounts and asked him to endorse them on the note. In our opinion, this falls far short of proving that payments were made in 1936 or 1937 by respondents, with the intent that such payments be applied on the note for the purpose of keeping the entire obligation alive, or at all.

The only intimation which might be drawn from Mr. Carey's testimony that there was any understanding between Mr. Walker and respondents that the latter were to have credit on the note for produce furnished their mother must be based upon the 1935 settlement, at which Mr. Carey was present. We are of the opinion the credit in connection with the 1935 settlement, testified to by Mr. Carey, must be limited to 1935.

Having in mind the principles hereinbefore announced, we are of the opinion the trial court would have been justified in granting respondents' motion for a nonsuit at the close of Mr. Carey's testimony, and we may say here that after an examination of the whole record, we are satisfied the judgment must be sustained because of a failure of proof that any payments were made by respondents, or either of them, on their note in either 1936 or 1937, regardless of the other contentions made by appellant.

However, we have decided to refer to the testimony of respondents, which the court admitted and upon which appellant apparently bases his claim that the court erred in holding there was a waiver of the statute (Rem. Rev. Stat., § 1211 [P.P.C. § 38-3]) by the guardian, thereby making the testimony of respondents admissible.

As we view the record, it is not necessary to, and we do not, pass upon the question of whether or not, by testifying to certain transactions between Mrs. Walker and respondents in 1935, appellant opened the door for testimony on the part of respondents as to such transactions.

Russell Sieg, one of the respondents, was called as a witness on behalf of respondents. The only question propounded to him relative to the endorsements on the note

or payments claimed to have been made thereon, which the court permitted the witness to answer, is the following:

"Q. Did you have a conversation with Mrs. Walker wherein Mr. Carey was present, in December, 1935, where she told you she was going to give you credit on that note of $50.00? A. No, sir."

■ Appellant cannot here claim the trial court erred in permitting the above question to be asked and answer given, for two reasons: First, because no objection was made by appellant to the question; and second, because when court and counsel were discussing what Mr. Sieg could and could not testify to, counsel for appellant stated:

"The only time they [respondents] could deny is to what he [Carey] testified to in 1935. Counsel admits our mouths are closed. She [Mrs. Walker] can't testify and they can't. The door is not open, except the transaction testified to, and he was testifying to a conversation between him and her, and they can deny any such transaction coming up, and that is all. The whole case is not thrown open, and I am willing to show all sorts of cases. Those cases opened up part of the transaction and don't tell all, which might result in injustice. They [respondents] are entitled to go into that—they are concerned as to whether or not that conversation [1935] took place or not. They can say it did or didn't, but they can't go beyond."

Whether or not counsel for appellant was entirely correct in his statement becomes immaterial, as it is apparent that the above question and answer go no further than counsel for appellant admitted respondents could go.

The following questions were asked Mrs. Sieg by counsel for respondents:

"Q. Did you hear Mr. Carey's testimony in reference to a conversation which occurred in his presence between your mother and you, or Mr. Sieg, or both of you, in reference to her giving you credit for $50.00 on the note? A. I heard the testimony this morning. Q. Did any such conversation occur, and/or did your mother ever make that statement, as related by him, in your presence? A. No, sir."

No objection was made to the above questions or answers by counsel for appellant.

For the reasons hereinbefore assigned, appellant can claim no error upon the admission of the above testimony of Mrs. Sieg.

■ The court sustained an objection to all questions propounded to Mrs. Sieg which attempted to bring out whether or not the witness authorized her mother to credit on the note the produce furnished by respondents. The court did permit Mrs. Sieg to testify further that in 1932, 1933, 1934, 1935, 1936, and 1937, respondents furnished their mother produce from the ranch. Limited as the questions were by the court, we are of the opinion no error was committed by the court in permitting Mrs. Sieg to testify.

Mr. Pincen, son-in-law of Mrs. Walker, Mrs. Pincen, and Mrs. Gertrude Boland, daughters of Mrs. Walker, were also called by respondents. About the only matters testified to by Mr. Pincen were that they boarded their children with Mrs. Walker while the children were attending school in Hartline and paid Mrs. Walker board; that the Siegs probably contributed farm produce to their mother during the thirties; that the Siegs probably did like the Pincens did, "When we butchered, we took them things." Mr. Pincen testified that while their children were living with Mrs. Walker they took her meat, apples, potatoes, butter, eggs, etc., for which they made no charge.

No objection was made by counsel for appellant to the above questions.

The only question propounded to Mrs. Boland, which the court permitted the witness to answer over the objection of appellant, and upon which any error could possibly be based, is the following:

"Q. Have you had any conversation with your mother, Mrs. Walker, with regard to Mrs. Sieg giving her any produce? (Objection by Mr. Southard overruled.) A. I have talked to her at different times, and she said my sister, Mrs. Sieg, was very liberal in giving things to her. Q. By 'her' you mean Mrs. Walker? A. Yes. W. E. SOUTHARD. Motion to strike. THE COURT. Motion denied."

■ It does not appear that Mrs. Boland was a party to this suit or has any interest therein, other than as a possible

heir of her mother. We are of the opinion Mrs. Boland was not disqualified from testifying, by Rem. Rev. Stat., § 1211, because of her interest. See *Kilbourne v. Kilbourne,* 156 Wash. 439, 287 Pac. 41.

For the reasons herein assigned, the judgment of the trial court is affirmed.

BEALS, C. J., MILLARD, STEINERT, and GRADY, JJ., concur.

[1]Reported in 161 P. (2d) 533.